In the Matter of **COMMODITY MERCHANTS, INC.**, Bankrupt.

**Harper C. ALLAN, as Trustee in Bankruptcy, Plaintiff-Appellant,**

v.

**ARCHER–DANIELS–MIDLAND CO., Defendant-Appellee.**

No. 75–2114.

United States Court of Appeals, Seventh Circuit.

Argued April 22, 1976.

Decided July 16, 1976.

James L. Magill, Springfield, Ill., for plaintiff-appellant.

Bret S. Babcock, Peoria, Ill., for defendant-appellee.

Before CUMMINGS and BAUER, Circuit Judges, and JAMESON, Senior District Judge.*

CUMMINGS, Circuit Judge.

Both the defendant, Archer-Daniels-Midland Co., Inc. (ADM), and the bankrupt, Commodity Merchants, Inc. (CMI), were active participants in the business of trading commodities futures. This case involves ADM's claim against the bankruptcy estate of CMI and a counterclaim by its trustee against ADM arising from the cancellation of various commodities contracts between the parties. Prior to CMI's bankruptcy, ADM and CMI engaged in commodities transactions with each other, resulting in CMI's building an account balance with ADM of $45,352.80.

In early December 1972, it became apparent to both concerns that CMI was in serious financial trouble and would not be able to fulfill its obligations under five contracts then outstanding between the two parties. In four of those contracts, CMI was the purchaser and in one, No. 10233, it was the seller of the commodity. On December 12, 1972, Albert Bailey, then vice president and secretary of CMI, conferred by telephone with ADM's representative John Simpson

---

* Senior District Judge William J. Jameson of the District of Montana is sitting by designation.

and told him that CMI was experiencing financial difficulties. Bailey told Simpson to withhold further shipments until CMI might resolve its financial difficulties. On the same date, the First National Bank of Springfield returned unpaid to ADM five of CMI's checks totaling $13,945.25. On that day ADM also learned that the commodities under contract No. 10233 were stopped in transit for CMI's failure to pay for them.

During subsequent telephone conferences, Bailey told Simpson that CMI had not yet secured additional financing to resolve its financial difficulties. On December 18, 1972, Bailey asked the credit manager of ADM for permission to allow CMI to pay its open account over a period of time. However, on December 19, 1972, ADM's credit manager telegraphed CMI that the four contracts were cancelled pursuant to a contractual provision allowing ADM to terminate if CMI's financial position became unsatisfactory.[1] CMI was adjudicated bankrupt ten days later. The commodities required by contract No. 10233 were never delivered.

In the bankruptcy proceeding, ADM filed a claim for $54,908.94,[2] consisting of CMI's account balance which the trustee admits is a legitimate claim (Br. 8) and a $9,556.14 loss which ADM suffered when CMI failed to perform under contract No. 10233. In response, the trustee filed a petition for a rule to show cause why the bankruptcy court should not enter judgment against ADM, claiming that the contracts between ADM and CMI were executory and asserting that pursuant to Section 70b of the Bankruptcy Act (11 U.S.C. § 110(b)),[3] he had notified ADM that he elected to go forward with the contracts and therefore claimed $125,816.14. By amendment of May 13, 1974, the trustee credited ADM with said $54,908.94 and made other adjustments reducing his prior request to a $19,945.79 judgment from ADM.[4]

On October 4, 1974, the bankruptcy judge entered findings of fact and conclusions of law allowing ADM's unsecured claim of $54,908.94 and denying CMI's claim for a judgment of $19,945.79 against ADM. In his conclusions of law, the bankruptcy judge decided that ADM had in good faith terminated its contracts pursuant to the legally enforcible termination clauses therein.[5] Since the contracts were no longer executory at the time of CMI's bankruptcy, the bankruptcy trustee's purported assumption of the contracts pursuant to Section 70b of the Bankruptcy Act (note 3, *supra*) was a nullity. Upon appeal by the bankruptcy trustee, the district court accepted the findings of fact of the bankruptcy judge and "found no evidence of a transfer of property of the debtor on account of antecedent debt." Therefore, the district court affirmed the bankruptcy judge's order of October 4, 1974. We likewise affirm.

1. The four contracts in question contained the following paragraph 12:

   "If Buyer's [CMI's] financial condition is found to be or becomes unsatisfactory to Seller [ADM] during the term of this contract, Seller may terminate this contract and may also terminate all other contracts covering purchase by Buyer of Seller's products whether or not Buyer may otherwise be in default, and no rights shall accrue to Buyer against Seller on account of such termination."

2. The claim was originally for $55,508.16 but was corrected to $54,908.94 (Supp. App. 8, 44).

3. Section 70b permits a bankruptcy trustee to assume executory contracts within sixty days after adjudication of bankruptcy.

4. The $19,945.79 consisted of ADM's alleged $74,854.73 profits on four of the cancelled contracts less the $54,908.94 owed to ADM by CMI. In subsequent May 28, 1975, and October 24, 1975, amendments to his original petition, the trustee adhered to CMI's claim for $19,949.79 and for the first time relied on Sections 1(30), 60 and 67(d)(2)(a) of the Bankruptcy Act (11 U.S.C. §§ 1(30), 96 and 107(d)(2)(a)).

5. Conclusion of law 5 provided as follows:

   "The said cancellation clauses do not violate the good faith provision of Section 1–203 of the UCC, as the term 'good faith' is defined in Section 1–201; nor are such clauses unconscionable under Section 2–302 of the UCC. In like manner, there is no basis in equity to modify enforcement of the cancellation provisions of the contracts."

   CMI now apparently concedes the validity of these clauses (Br. 17, 19).

■ The bankruptcy trustee no longer seriously argues that the contracts were executory when he attempted to assume them under Section 70b of the Act. The purchase contract (No. 10233) had already been breached by CMI. Paragraph 12 of the other contracts permitting ADM to terminate upon CMI's unsatisfactory financial condition is a garden variety contractual clause and consistent with Article 2–609 of the Uniform Commercial Code dealing with the right to adequate assurance of performance. Ill.Rev.Stats. (1975) ch. 26, § 2–609. The validity of such a clause is well settled,[6] and CMI concedes that its financial condition permitted ADM to terminate the contracts on December 19, 1972, ten days before the filing of the bankruptcy petition. Accordingly, Section 70b of the Bankruptcy Act did not permit the trustee to assume these contracts.

After losing the Section 70b point before the bankruptcy judge, the trustee shifted ground by amending his petition to show reliance on Sections 1(30), 60 and 67(d)(2)(a) of the Bankruptcy Act (note 4 *supra*). This belated tactic is also of no avail.

■ While the broad definition of "transfer" in the Bankruptcy Act[7] would include transfers of CMI's property by debtor or creditor, when ADM cancelled the four contracts, there was no transfer of CMI's property. The essence of a transfer is the relinquishment of a valuable property right. *In re Columbus Malleable, Inc.*, 459 F.2d 118, 120 (6th Cir. 1972); *In re Forney*, 299 F.2d 503, 506 (7th Cir. 1962). At the time the four contracts were cancelled CMI acknowledged that it was not entitled to the commodities covered by the contracts, for its Mr. Bailey had told ADM to withhold further shipments. Quite understandably, the contracts contemplated that CMI could not obtain ADM's commodities if in an unsatisfactory financial situation, as it was. ADM did not reacquire any rights from CMI upon cancellation, for ADM had reserved the option of terminating the contracts if CMI's financial condition deteriorated.

The trustee argues, however, that the cancellation deprived CMI of its property right to resell the contracts. If the contracts had been freely transferable, perhaps we could agree. However, paragraph 4 of each of them forbade CMI to assign its rights under the contract without ADM's written consent and such consent was neither requested nor given.[8] Furthermore, purchasers would hardly be obtainable in view of the red flag termination provisions of paragraph 12 (note 1 *supra*), and such contracts are rarely assigned (Supp. App. 49).

We also disagree with the trustee's claim that the four contracts had a market value on the date of cancellation. He argues that on that date similar commodity futures con-

---

**6.** *Berry's Sons Co. v. Monarch Gasoline & Oil Co.*, 32 F.2d 74, 75 (8th Cir. 1929); *Louis Stern Sons, Inc. v. Adolf Gobel, Inc.*, 113 F.Supp. 853, 854 (D.N.J.1953); *W. P. Iverson & Co., Inc. v. Dunham Mfg. Co.*, 18 Ill.App.2d 404, 415, 416, 152 N.E.2d 615 (1st Dist. 1958); see also 1 Corbin on Contracts § 165. In *Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co.*, 532 F.2d 572, 578, 582 (7th Cir. 1976), we recently impliedly recognized that such a clause would have been valid if the plaintiff had included it in its contract with defendant.

**7.** Section 1(30) of the Act provides:
"  'Transfer' shall include the sale and every other and different mode, direct or indirect, of disposing of or of parting with property or with an interest therein or with the possession thereof or of fixing a lien upon property or upon an interest therein, absolutely or conditionally, voluntarily or involuntarily, by or without judicial proceedings, as a conveyance, sale, assignment, payment, pledge, mortgage, lien, encumbrance, gift, security, or otherwise; the retention of a security title to property delivered to a debtor shall be deemed a transfer suffered by such debtor."

**8.** Although a partner of CMI's largest creditor stated in an affidavit that the contracts would have been purchased by commodity traders (Supp. App. 48), he must have overlooked paragraphs 4 and 12 of the contracts. In any event, his statements cannot be credited because under UCC § 2–202 (Ill.Rev.Stats. (1975) ch. 26, § 2–202) oral testimony may not be used to contradict the written terms of a contract.

While he also stated that ADM could have shipped the goods to CMI on an order bill of lading accompanied by a draft to CMI's bank, the record shows that CMI could not have satisfied such cash in advance sales.

tracts had an ascertainable market value and that the contracts here therefore had the same value. It is uncontested that before cancellation on December 19 CMI could have written and sold a separate contract whereby it agreed to sell the commodities it was to purchase from ADM. The trustee's argument is premised on equating this sale of a separate contract with an assignment of the contracts between ADM and CMI. Because these transactions differ materially with regard to the obligations they impose upon ADM, his argument must fail. The sale of the separate contract would be valid without regard to CMI's interests in the underlying goods and hence ADM would have no interest in the transaction. However, the assignment of the contracts at issue here would require ADM to accept a new obligor. Because it reserved the right to refuse to accept a third-party's promise in lieu of CMI's, the assignment is not the functional equivalent of the sale of the separate contract, and the market would not treat them as such. Due to their limitations on alienability, the contracts did not have a market value (*In re Portland Newspaper Publishing Co.*, 271 F.Supp. 395, 398 (D.Ore.1967), affirmed, 417 F.2d 1277 (9th Cir. 1969)), and this reinforces our conclusion that no transfer of property occurred in this case. There being no transfer of CMI's property to ADM, of course there was no preferential transfer to ADM on account of an antecedent debt (Section 60 of the Bankruptcy Act)[9] nor fraudulent transfer (Section 67(d)(2)(a)).[10]

Judgment affirmed.

---

**9.** Since no existing debt between ADM and CMI was forgiven, *Wilson v. Holub*, 202 Iowa 549, 210 N.W. 593 (1926) is inapplicable.

**10.** Other arguments presented by the trustee are not sufficiently meritorious to warrant discussion herein.