**In the Matter of R.M. CORDOVA INTERNATIONAL, INC., Debtor.**

**Bankruptcy No. 87–00644.**

United States Bankruptcy Court,
D. New Jersey.

Aug. 12, 1987.

442

Braverman & Lester, Hackensack, N.J., for trustee.

Shanley & Fisher, P.C. by Walter J. Fleischer, Jr., Morristown, N.J., and McGuire, Woods, Battle & Boothe by H. Slayton Dabney, Jr., and Joseph S.L. St. Amant, Richmond, Va., co-counsel for intervenors C & T Refinery, Inc., Dial Corp. and Safic Alcan & Cie.

Baker & McKenzie by Robert B. Davidson, and Charles Cummings, New York City, co-counsel for Cantzlaar-Mirandolle B.V., E.G. C. Cornelius & Co. Ltd., Peter Cremer GMBH & Co., Frint Ltd. and Transoil Oils and Fats B.V.

Orrick, Herrington & Sutcliffe by Thomas C. Mitchell, San Francisco, Cal., for Pacific Molasses Co.

Brauner, Baron, Rosenzweig, Kliger, Sparber, Bauman & Klein by Howard L. Simon, New York City, Jamieson, Moore, Peskin & Spicer, P.C. by Ann F. Kiernan, Princeton, N.J., for Czarnikow-Rionda Brokerage Co., Inc.

Cleary, Gottlieb, Steen & Hamilton by Laurie K. Chisoln, New York City, for intervenor Henkel KGaA.

## OPINION

WILLIAM F. TUOHEY, Bankruptcy Judge.

The present matter comes before the Court upon the Trustee's order to show

cause seeking authorization for the Trustee to assume and liquidate certain executory contracts pursuant to Section 365 of the United States Bankruptcy Code, and to reject certain other executory contracts, and upon cross-motion of several creditors to vacate the automatic stay pursuant to Code Section 362(d). This Court has jurisdiction over this matter pursuant to 28 U.S.C. Section 1334 and 28 U.S.C. Section 157. The following shall constitute this Court's findings of fact and conclusions of law.

The Debtor herein, R.M. Cordova International, Inc. (hereinafter, "Cordova"), incorporated under the laws of the State of New Jersey, is a subsidiary of a Philippine coconut producer. On June 1, 1986, Cordova opened its offices in Secaucus, New Jersey for the purpose of trading in coconut oil and coconut oil futures. On January 15, 1987, Cordova sent its trading partners a notice indicating its intention to discontinue all its operations effective January 31, 1987. The notice stated that the company had been forced to make the decision to discontinue operations because of financial problems caused in part by a four months strike in the Philippines against its principal supplier, resulting in a shut down of the supplier's production operations. A subsequent letter from Cordova to its trading partners dated January 28, 1987, indicates that the supplier's failure to ship coconut oil had caused severe financial problems for Cordova, and that rising coconut oil prices had made shipments from other Philippine producers and other locations prohibitive. The January 28, 1987 letter further stated that all of the assets of Cordova had been committed to honoring its contracts, but that such assets had been insufficient. Thus, since continuing operations would have resulted in greater expenses and losses, Cordova determined to cease its operations.

On February 5, 1987, four of Cordova's creditors who constituted entities with whom Cordova traded coconut oil filed an involuntary petition to liquidate Cordova under Chapter 7 of the Bankruptcy Code.[1] On February 25, 1987, the Court entered an order for relief under Chapter 7 without opposition from Cordova.

The primary assets and liabilities of the Debtor consist of contracts to buy and/or sell coconut oil. Pursuant to the terms of the contracts, all were made subject to the trading rules of the National Institute of Oil Seed Products (hereinafter, "NIOP") or the Federation of Oils, Seeds and Fats Associates (hereinafter, "FOSFA").

Most of Cordova's contracts were entered into before mid-October, 1986, after which the market price for coconut oil rose significantly above the agreed upon contract prices. The sharp rise in the market price made the pre-October contracts at the "old" prices very favorable to the buyers and very unfavorable to the sellers. Cordova, which had contracts to sell much more coconut oil than it had contracts to buy, found itself in an unfavorable financial position, resulting in a net "short" and, ultimately in bankruptcy.

Certain of the contracts enabled the Debtor to purchase coconut oil at contract prices which were below market price on the date of the filing of the involuntary bankruptcy petition (hereinafter referred to as, the "Favorable Contracts"). Cordova also had contracts to sell coconut oil at contract prices which were below market price on the date of the filing of the involuntary petition (hereinafter referred to as, the "Unfavorable Contracts").

The record indicates[2] that of the thirty trading partners listed by Cordova, twenty

---

1. The four petitioning creditors were:
   C & T Refinery, Inc.,
   Colfax, Inc.
   Lou Ana Foods, Inc.
   Transoil Oils and Fats, B.V.

2. See Exhibit "F" to the certification of counsel for petitioning creditors in support of application for entry of order for relief dated February 25, 1987. The list of trading partners is modified herein to indicate only the ten trading partners included in the Trustee's application. The list provides the total value of contracts for Cordova to purchase coconut oil (the Favorable Contracts) is $3,110,225.00; the list further indicates the total value of contracts for Cordova to sell coconut oil is $15,095,874.45. The Court further notes that exhibit "A" to the Trustee's application provides the total value of contracts

had contracts only to buy coconut oil from Cordova (hereinafter, the "buy-only trading partners"), nine had contracts both to buy and sell coconut oil, and one had a contract to sell only. Significantly, of the ten trading partners with contracts to sell coconut oil to Cordova, eight[3] had offsetting contracts to buy coconut oil back from the Debtor at prices which would have yielded substantial profits to the trading partners.

The record in this matter further indicates that on February 27, 1987, the Trustee began efforts to contact the ten traders to the Debtor's Favorable Contracts in an effort to determine whether those traders would be performing such contracts or paying liquidated amounts in respect of same. The Debtor indicates that two parties did not respond to the Trustee's communication, but that the parties responding indicated that they would not perform under the contracts.[4]

By the instant order to show cause, the Trustee, with the support of various intervenors (hereinafter, the "Intervenors")[5] seeks to assume the Favorable Contracts listed in exhibit "A" annexed to the Trustee's application in an effort to increase the

bankruptcy estate for the benefit of the unsecured creditors of the Debtor. The Trustee's position is that these contracts to buy coconut oil were executory as of the date of the filing of the involuntary petition. Further, the Trustee argues that pursuant to Section 556 of the Bankruptcy Code and the trading rules of NIOP and FOSFA (if same are superior to the provisions of the Code) the Trustee has the right to liquidate the Favorable Contracts and to demand said liquidation occur as of the date of the filing of the bankruptcy petition.[6]

Counsel for the five European traders heretofore cited, as well as Pacific Molasses Company, and Czarnikow-Rionda Brokerage Co., Inc., have strongly objected to the Debtor's application. The collective thrust of their objections is threefold. First, the objecting traders argue that all of the contracts the Trustee now seeks to assume were, in fact, "closed" or "washed out" at or prior to the filing of the bankruptcy petition, and are therefore not executory in nature.[7] Second, the objecting parties argue that notwithstanding the above, the determination as to whether or

for the Debtor to purchase coconut oil is $3,126,800.00.

| | Contracts to Purchase Coconut Oil | Contracts to Sell Coconut Oil |
| --- | --- | --- |
| Cantzlar | $ 913,500 | $ 1,479,250 |
| Cornelius | 1,354,125 | 2,437,625 |
| Czarnikov | 75,000 | 75,000 |
| Frint | 33,000 | 231,000 |
| Cremer | 60,000 | 557,500 |
| Macki | 25,000 | 201,625 |
| Pacmol | 107,250 | 239,250 |
| Trans Grain | 181,000 | 1,432,750 |
| Transol | 118,250 | 442,750 |
| Uni Deco | 243,100 | 30,250 |

3. Of these eight, the following five are European parties which have joined in opposition to the Trustee's order to show cause:
Cantzlaar-Mirandolle B.V.
E.G. Cornelius & Co., Ltd.
Frint Limited
Peter Cremer GMBH & Co.
Transol Oils & Fats B.V.

4. See Trustee's communication dated February 27, 1987 and responding telexes annexed to the memorandum of intervenors in support of motion to assume dated June 8, 1987.

5. Of the "buy-only trading partners," C & T Refinery, Inc., Dial Corporation, Safic Alcan &

Cie, and Henkel KGaA have obtained the Court's permission to intervene in this matter in support of the Trustee.

6. With respect to the Unfavorable Contracts requiring the Debtor to sell coconut oil at prices below the market value for similar contracts on the date of the petition, the Trustee's position is that such contracts are also executory in nature, and therefore it is the Trustee's intention to reject all such contracts unfavorable to the Debtor. In addition, through its order to show cause, the Trustee is requesting this Court to enter an order authorizing the Trustee to assume, free from claim of offset, any and all of the contracts listed in exhibit "A", and authorizing the Trustee to set February 5, 1987, as the liquidation date for the contracts so listed.

7. The Court notes the "washed out" contracts refer to contracts that were the subject of some form of prepetition wash out agreement but which had not been settled at the time the petition was filed. The contracts which the objecting parties argue were closed were contracts that were not the subject of any prepetition "wash out" agreement but, they contend, were in fact "closed" pursuant to NIOP Rule 54, as well as the standard FOSFA bankruptcy/insolvency clause.

not such contracts are, in fact, executory, should be made pursuant to arbitration in accordance with the terms of the various contracts in question. Third, even if the contracts are properly categorized as executory, the objecting parties assert that the Trustee's application must still fail at least with respect to those trading partners entitled to offset their losses against their profits, leaving no balance due to the Debtor or the estate.

At the hearing in this matter, the Court entertained argument on the Trustee's motion to assume the certain executory contracts listed on Trustee's exhibit "A" as well as a notice of cross-motion brought by the five European traders seeking to vacate the automatic stay pursuant to Section 362(d) of the Bankruptcy Code and to permit the cross-movants to commence arbitration against the Debtor in accordance with the proposed demands for arbitration pursuant to their respective contracts with the Debtor. At the aforesaid hearing, this Court reserved decision as to both the Trustee's application and the cross-motion of the five European parties and extended the Section 365 assumption or rejection period.

The threshold issue which this Court must address is whether or not the Trustee may assume the "favorable contracts" listed in its application pursuant to Section 365 of the Bankruptcy Code.

■ Preliminarily, the Court notes that the Debtor, as well as all trading parties to this proceeding, are "forward contract merchants" as that term is defined under § 101(25) of the Bankruptcy Code.[8]

## THE TRUSTEE MAY NOT ASSUME FORWARD CONTRACTS THAT WERE BREACHED BY THE DEBTOR PREPETITION.

The Bankruptcy Code, pursuant to § 365, gives the Trustee the power to either reject or assume an executory contract subject to Court approval. The rationale underlying this authority is that the Trustee should be insulated from contracts that impose burdensome liabilities upon the estate, but, in the alternative, should be able to take advantage of favorable contracts that benefit the estate. Weintraub and Resnick, *Bankruptcy Law Manual*, § 7.10 (15th Ed. 1986). The Bankruptcy Code, however, does not contain a definition of "executory contract." Therefore, the Court must look to outside sources to construe the meaning of this term in the context of the Bankruptcy Code.

In answer to the question, what is an executory contract, Professor Williston has stated: "All contracts to a greater or lesser extent are executory. When they cease to be so, they cease to be contracts." (1 *Willison on Contracts*, 28 3rd Ed.1977). Notes of the Committee on the Judiciary, Senate Report No. 95–989 states with regard to Section 365(a) (Executory Contracts and Unexpired Leases):

> Though there is no precise definition of what contracts are executory, it generally includes contracts on which performance remains due to some extent on *both sides*. (Emphasis added.)

See also 2 *Collier on Bankruptcy*, ¶ 365.02 (15th Ed.1987).

Professor Countryman formulated an often cited definition of an executory contract which has been widely accepted as:

> A contract under which the obligation of *both the bankrupt and the other party* to the contract are so far unperformed that the failure of either to complete the performance would constitute a material breach excusing the performance of the other. (Emphasis added.)

Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn.L.Rev. 439, 460 (1973), cited in *In Re Kendall Grove Joint Venture vs. Martinez-Esteve*, 59 B.R. 407 (S.D.Fla.1986); *In Re Murtishi*,

---

**8.** Section 101(25) defines a "forward contract merchant" as "a person whose business consists in whole or in part of entering into forward contracts as or with merchants in commodities." Moreover, a "forward contract" means "a contract (other than a commodity contract) for the purchase, sale, or transfer of a commodity, or product or byproduct thereof, with a maturity date more than two days after the date the contract is entered into." (See 11 U.S.C. § 101(24).)

55 B.R. 564 (N.D.Ill.1985); *In Re Alexander*, 670 F.2d 885 (9th Cir., 1982).

Although there has been no definitive guideline established for determining what constitutes an executory contract, it has been generally recognized that a reconciliation of the various approaches taken has yielded the conclusion that each court must undertake its own independent analysis of the contract in question and apply flexible standards aimed at measuring the consequences of an application of § 365 in terms of both its benefit to the estate, as well as its effect on the protection of creditors. *In re Richmond Metal Finishers, Inc.* 34 B.R. 521, 523 (Bankr.E.D.Va.1983); *In re Booth*, 19 B.R. 53, 56–57 (Bankr.D.Utah 1982).

In *Murtishi, supra*, motion was heard upon application of the debtors-in-possession to reject two contracts pursuant to 11 U.S.C. Section 365. The *Murtishi* Court concluded that the contracts in question were no longer executory and therefore not subject to the rejection provisions of Section 365. There, the Bankruptcy Court stated:

> "Initially, a court faced with a motion ... pursuant to § 365(a) should focus on the situation where both the debtor and the other party to the contract have significant obligations to perform under the contract *at the time the petition is filed* R. Ginsberg, Bankruptcy, § 7002 (1985)." (Emphasis in the original.)

*Murtishi, supra*, 55 B.R. at page 567. The Court recognized the general principle that if performance no longer remains due on either side at the time the petition is filed, neither the Court nor the Trustee is confronted with an executory contract that can be either rejected or assumed. *In Re Murtishi, supra*, 55 B.R. at 567 (citing *Matter of Newcomb*, 744 F.2d 621, 624 (8th Cir., 1984).

Significantly, for the purposes of the instant application, taking the above reasoning one step further, the *Murtishi* Court recognized that when a debtor has affirmatively *breached* a contract prepetition, with the result that the other party has no further duty to perform, but rather holds a claim against the debtor, the contract is no longer executory for purposes of Section 365. *Murtishi, supra*, 55 B.R. at page 567.

In light of the above, it is appropriate to inquire as to the presence or absence of a breach in the present context. See *Matter of Investors Development Co.*, 7 B.R. 772, 774 (Bankr.D.N.J.1980). Moreover, the Court is mindful of the decision in *Matter of Triangle Laboratories, Inc.*, 663 F.2d 463 (3rd Cir.1981) wherein the Third Circuit held that executory contracts validly terminated prior to the institution of bankruptcy proceedings are not resurrected by the filing of the petition in bankruptcy. See also *Collier, supra*, at ¶ 365.02 (If the contract has expired by its own terms or has been terminated prior to the commencement of the bankruptcy case, then there is nothing left to assume.).

■ With respect to the forward contracts for the purchase and sale of coconut oil herein, this Court finds the effect of Cordova's January 15, 1987 notice to its trading partners that effective January 31, 1987, it would "discontinue all its operations" operated as an *anticipatory repudiation*[9] of the aforesaid contracts as that term is hereinafter defined. Moreover, this Court finds the subsequent January 28, 1987 letter from Cordova to the same various trading partners explaining the reasons for its decision to discontinue operations, irrefutably supports that point. The January 28, 1987 letter specifically states in pertinent part:

> All [Cordova's] assets have been committed to honoring its contracts, but they have been insufficient. Continuing operations will result in greater expenses and losses and, therefore, [Cordova] has determined to cease its operations.

An "anticipatory breach of contract" has been defined as occurring when the promissor, before he has committed a breach, makes a positive statement to his promissee indicating that he will not or cannot perform his contractual duties. *Black's*

---

**9.** The doctrine of anticipatory repudiation only has relevance to the case *sub judice* when viewed in conjunction with Code Section 556 as set forth herein.

*Law Dictionary,* 85 (15th Ed.1979). Moreover, another commentator has provided:

> Any statement or conduct of a party which reasonably conveys an intent on his part not to perform or which renders it impossible for him to perform constitutes an anticipatory repudiation of the contract by him.

2 *Anderson, Sales,* Uniform Commercial Code, § 2–610:5 (2nd Ed.1983). See also N.J.S.A. 12A:2–610 (New Jersey law is directly in accord with U.C.C. § 2–610.)

The Court finds the contents of both the January 15, 1987 and January 28, 1987 communications to the ten traders in question constituted an anticipatory breach by the Debtor.

The Court further finds ample support from the responses received to the Trustee's telex dated February 27, 1987, (advising such traders that he had been appointed Trustee in bankruptcy, and requesting their advices as to whether or not they intended to perform under the contracts or pay damages in respect of same) that said traders had effectively terminated all contracts with the Debtor *prepetition,* either through an express "wash-out" under the agreements or by the January 15th and January 28, 1987 communications triggering a closure of the "open" contracts of the Debtor under NIOP Rule 54(1) or the equivalent FOSFA standard bankruptcy/insolvency clause.[10]

In this regard, NIOP Rule 54(i) provides:

**Rule 54—Bankruptcy or Insolvency**

1. If before the fulfillment of this contract either party shall suspend payment, commit an act of bankruptcy, notify any of his creditors that he is unable to meet his debts or that he has suspended payment or that he is about to suspend payment of his debts, convene, call or hold a meeting either of his creditors or to pass a resolution to go into liquidation (except for a voluntary winding up of a solvent company for the purpose of reconstruction or amalgamation) or shall apply for an official moratorium, have a petition presented for winding up or shall have a Receiver appointed, the contract shall forthwith be closed, either at the market price then current for similar goods or, at the option of the other party, at a price to be ascertained by repurchase or resale and the difference between the contract price and such closing-out price shall be the amount which the other party shall be entitled to claim or shall be liable to account for under this contract. Where no such resale or repurchase takes place, the closing-out price shall be fixed by the Settlement Price Committee of the National Institute of Oilseed Products. Should either party be dissatisfied with the price, the matter shall be referred to arbitration.

## SECTION 556 OF THE BANKRUPTCY CODE SUPERSEDES BANKRUPTCY CODE § 365(e)(1) AS RESPECTS THE VALIDITY OF AN INSOLVENCY CLAUSE IN FUTURE CONTRACTS

■ With respect to the application of NIOP Rule 54(1) and the equivalent FOSFA clause to the instant application, the Trustee asserts that these bankruptcy termination clauses do not affect the Trustee's authority to assume the contracts, citing Bankruptcy Code Section 365(e)(1).[11]

As applied in the context of the present situation, the Court rejects the Trustee's

---

**10.** See responding telexes annexed as exhibits "B" through "N" of counsel for the intervenors memorandum in support of motion to assume dated June 8, 1987.

**11.** Bankruptcy Code Section 365(e) provides:

(e)(1) Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on—

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title; or

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

argument as respects the application of Section 365(e)(1). While the Court fully recognizes the common usage of Section 365(e)(1) to invalidate bankruptcy termination clauses (sometimes referred to as ipso facto clauses) which provide that the financially secure party has the right to terminate or modify a contract automatically upon the other party's bankruptcy or insolvency, the Trustee's reliance upon same in the context of the present case is clearly misplaced.

The Code does contain limited exceptions to the invalidation of ipso facto clauses. Specifically, Section 556 of the Bankruptcy Code provides:

**Contractual right to liquidate a commodities contract or forward contract.**

The contractual right of a commodity broker or forward contract merchant to cause the liquidation of a commodity contract, as defined in Section 761(4), or forward contract because of a condition of the kind specified in Section 365(e)(1) of this title, and the right to a variation or maintenance margin payment received from a trustee with respect to open commodity contracts or forward contract, shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by the order of a court in any proceeding under this title. As used in this section, the term "contractual right" includes a right set forth in a rule or bylaw of a clearing organization or contract market or in a resolution of the governing board thereof.

Section 556 was incorporated into the Bankruptcy Code July 27, 1982, by Public Law No. 97–222, "Technical and substantive changes in bankruptcy with respect to securities and commodities." According to Professor Collier, Section 556 is one of several provisions contained in the Code which minimizes the likelihood that the insolvency of one commodity broker or for-

ward contract merchant may lead to that of another. *4 Collier on Bankruptcy*, § 556.-01 (15th Ed.1987) The section states that an entity's filing under the provisions of Title 11, does not prevent a commodity broker or forward contract merchant from exercising a contractual right to cause the liquidation of a commodity contract or forward contract. Moreover, the exercise of such contractual right to cause such liquidation is also immune from the order of a bankruptcy court in any proceeding under Title 11.[12]

As the legislative history makes clear, the right to liquidate a commodity contract pursuant to Section 556, is "the right to close out an open position." (H.Rept. No. 97–420, 97 Cong., 2nd Sess. P. 4 (1982) and 128 Cong.Rec. § 8,133 (July 13, 1982)).

According to commentators Feldman & Somner, Code Section 556 assures that commodity brokers and forward contract merchants will be able to exercise contractual rights to close out an insolvent customer's commodity or forward contract. Said commentators note that any other result will create difficulties for the commodity industry. The failure to liquidate open positions of an insolvent customer would expose a commodity broker or forward contract merchant to liability for large losses with respect to those positions and the consequent inability of the broker or merchant to meet its obligations to make margin payments, all of which could adversely affect the other members of the clearing chain. Feldman & Sommer, "The Special Commodity Provisions of the New Bankruptcy Code," 37 *Business Lawyer*, 1487 (July, 1982).[13]

■ Upon careful review, this Court is satisfied that Section 556 of the Bankruptcy Code was enacted to address just such a situation as is presented in the instant case. As aforestated, the Court finds that those contracts which were not expressly "washed out" prepetition under the agree-

---

12. In addition, Section 556 additionally establishes the right of a commodity broker or forward contract merchant to receive from a Trustee in bankruptcy variation or maintenance margin payments with respect to open commodity contracts or forward contracts of a customer. *4 Collier on Bankruptcy, supra,* § 556.01 at 556–2.

13. The Court notes the treatise of T. Russo, *Regulation of the Commodities, Futures and Options Market,* Section 18.17, is to the same effect.

ments in question were, in effect, "closed" by operation of NIOP Rule 54(1). The Court further specifically upholds the validity of NIOP Rule 54(1) under Section 556 of the Bankruptcy Code. Since the Court has found that all such contracts were, in fact, closed prior to the filing, the contracts were not executory, and thus not subject to assumption by the Trustee pursuant to Section 365. See *In Re Commodity Merchants, Inc.*, 538 F.2d 1260, 1262 (7th Cir., 1976) (Commodities futures contracts between the parties were cancelled pursuant to a contractual provision prior to the filing of a petition in bankruptcy and thus were not capable of being assumed by the Trustee under Section 70(b) of the former Bankruptcy Act).

## THE ISSUE OF DAMAGES FLOWING FROM BREACH OF FORWARD CONTRACTS JUSTIFIES SUBMISSION TO ARBITRATION SHOULD THE PARTIES NOT BE ABLE TO CONSENTUALLY AGREE.

Having rejected the Trustee's motion to assume pursuant to Sections 365 and 556 of the Bankruptcy Code, the Court must now turn its attention to the cross-motion of the five European parties to lift the automatic stay pursuant to Section 362(d) of the Bankruptcy Code in order to compel arbitration. Citing the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (hereinafter referred to as the "Convention"), 21 U.S. T. 2517, T.I.A.S. No. 6997 and the Federal Arbitration Act adopted to implement the Convention, 9 U.S.C. § 201 et seq.,[14] the five European parties in support of their cross-motion contend that this Court is required to, in effect, compel arbitration under the NIOP and FOSFA trading rules pursuant to the contracts entered into between the parties.[15] It is the contention of the five European parties that there can be no doubt that the arbitration sought to be commenced are "international arbitrations" which fall under the Convention, as the legal relationship between the cross-movants and the Debtor is commercial in nature, and in each of the proposed arbitrations one of the parties is a citizen of either

14. Article II of the Convention provides:

1. Each Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship whether contractual or not, concerning a subject matter capable of settlement by arbitration.

2. The term "agreement in writing" shall include an arbitral clause in a contract or an arbitration agreement, signed by the parties or contained in an exchange of letters or telegrams.

3. The Court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties refer the parties to arbitration, unless it finds that the said agreement is null and void, in operative or incapable of being performed.

15. Rule 60 of the NIOP Trading Rules provides:
**ARBITRATION IS COMPULSORY**
Any dispute arising under contracts subject to these Rules, including all claims for damages for default in performance, which can not be settled amicably between interested parties, shall be submitted to arbitration before a committee selected by the American Arbitration Association; all said parties are deemed to agree and to promise to abide by the award and findings of the arbitrators, and in the event of an adverse decision, to make prompt settlement thereof.

Similarly, Paragraph 25 of FOSFA contract No. 54 provides:
ARBITRATION. Any dispute arising out of this contract, including any question of law arising in connection therewith, shall be referred to arbitration in London (or elsewhere if so agreed) in accordance with the Rules of Arbitration and Appeal of the Federation of Oils, Seeds and Facts Association Limited, in force at the date of this Contract and of which both parties hereto shall be deemed to be cognizant.

Neither party hereto, nor any persons claiming under either of them, shall bring any action or any other legal proceedings against the other of them in respect of any such dispute until such dispute shall first have been heard and determined by the arbitrators, umpire or Board of Appeal (as the case may be) in accordance with Rules of Arbitration and Appeal of the Federation and it is hereby expressly agreed and declared that the obtaining of an Award from the arbitrators, umpire or Board of Appeal (as the case may be), shall be a conditioned precedent to the right of either party hereto or of any person claiming under either of them to bring any action or other legal proceedings against the other of them in respect of any such dispute.

the United Kingdom, the Netherlands or West Germany.[16] Counsel for the Trustee disagrees, and argues that this Court should exercise its discretion in favor of judicial resolution of the disputes between the parties. Specifically, counsel for the Intervenors, in support of the Trustee's position, contends that the non-debtor parties are claiming a number of defenses as to specific contracts, and counsel further contends that the Court need only rule on an order regarding assumption, and thereafter consider analysis on a case by case basis of the specific contracts in question.

■ This Court begins its consideration of the within cross-motion with the recognition of an "emphatic" federal policy in favor of arbitration which applies with special force in the field of international commerce. *Mitsubishi Motors Corp. vs. Solar Chrysler-Plymouth, Inc.*, 473 U.S. 614, 632, 105 S.Ct. 3346, 3357, 87 L.Ed.2d 244 (1985). In the bankruptcy context however, as the Court in *In Re Double TRL, Inc.*, 65 B.R. 993, 15 B.C.D. 190, 193 (Bankr.E.D.N.Y.1986) recently recognized, the enforcement of contractual arbitration clauses is left to the sound discretion of the bankruptcy court. In addressing the conflicting policies underlying the Arbitration Act and the Bankruptcy Code and holding that the Bankruptcy Code impliedly modified the Arbitration Act, the Third Circuit in *Zimmerman v. Continental Airlines, Inc.*, 712 F.2d 55, 59 (3th Cir., 1983); cert. denied, 464 U.S. 1038, 104 S.Ct. 699, 79 L.Ed.2d 165 (1984) has stated:

> Bankruptcy proceedings ... have long held a special place in the federal judicial system. Because of their importance to the smooth functioning of the nation's commercial activities, they are one of the few areas where Congress has expressly preempted state court jurisdiction....

While the sanctity of arbitration is a fundamental federal concern, it cannot be said to occupy a position of similar importance. Therefore, because of the importance of bankruptcy proceedings in general, and the need for the expeditious resolution of bankruptcy matters in particular, we hold that the intentions of Congress will be better realized if the Bankruptcy Reform Act is read to impliedly modify the Arbitration Act.

Thus, while the bankruptcy court would have the power to stay proceedings pending arbitration, the use of this power is left to the sound discretion of the court.

This court has heretofore ruled that the contracts in question were not executory so as to be assumed by the Trustee in bankruptcy in this Chapter 7 proceeding. Implicit in this finding is the express determination by this Court that the issues involved arising under Section 365 and Section 556 of the Bankruptcy Code are unique bankruptcy issues dealing with matters relegated to the jurisdiction of the bankruptcy court, and thus within the proper exercise of this Court's discretion to retain its jurisdiction over the above. *Societe Nationale v. Distrigas*, No. 86–2014–Y, slip opinion (D.Mass. March 17, 1987). Having so found, the Court must now consider whether or not to modify the automatic stay of these proceedings pursuant to Section 362(d) of the Bankruptcy Code, to submit the issue of damages to arbitration.

■ The factors to be considered in exercising the Court's discretion to allow arbitration include (1) the degree to which the nature and extent of the litigation and evidence makes the judicial forum preferable to arbitration; (2) the extent to which special expertise is necessary to resolve the

---

**16.** The Court notes that one of the trading partners involved herein is Pacific Molasses Company, a domestic trader and as such may be subject to the provision of the United States Arbitration Act. (Arbitration Act) 9 U.S.C. § 1. Specifically 9 U.S.C. § 3 mandates:

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in

which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration.

dispute; and (3) the identity of the persons comprising the arbitration committee and their record in resolving disputes between the parties. *In re Double TRL, Inc.,* 65 B.R. 993, 15 B.C.D. 190, 193 (Bankr.E.D.N.Y.1986).

The question as to the amount of settlement damages flowing to the traders in question and/or the estate under the applicable NIOP or FOSFA Trading Rules as a result of the Debtor's prepetition anticipatory repudiation of the "open" contracts, triggering a closure under NIOP Rule 54(1), as well as the effect of the express "wash out" provisions of certain of the agreements are unique issues arising under the particular contracts in question and require the expertise of arbitrators familiar with the coconut oil industry at large.

It is undisputed that a knowledgeable review of the evidence, both documentary and testimonial is necessary to place the contracts in question in a posture ripe for settlement. However, in view of the fact that the claims against the estate far exceed the debtor's equity, there is no reason to believe that the various parties to the contracts in question cannot consentually settle the amounts of their contract claims with the Trustee once an order denying assumption is entered herein. However, should the Trustee and the contract claimants not settle the amounts involved, the matter of the amount of moneys due the parties under the contract is referred to arbitration, and the stay is lifted to allow the arbitration of said issue.

For the foregoing reasons, this Court concludes that the contracts were not executory at the time the involuntary petition was filed, and therefore are not subject to assumption by the Trustee pursuant to Section 365 of the Bankruptcy Code. Moreover, Section 365(e) does not operate to invalidate the bankruptcy termination clauses under the NIOP and/or FOSFA rules pursuant to the caveat under Bankruptcy Code Section 556. Accordingly, Trustee's motion to assume is hereby denied. In cases where it is found necessary, cross-movant's motion to modify the stay and proceed with arbitration is allowed for the reasons stated above.