# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-10881

United States Court of Appeals
Fifth Circuit

**FILED**

February 3, 2017

Lyle W. Cayce
Clerk

HOMETOWN 2006-1 1925 VALLEY VIEW, L.L.C.,

> Plaintiff - Appellant

v.

PRIME INCOME ASSET MANAGEMENT, L.L.C.; PRIME INCOME ASSET MANAGEMENT, INCORPORATED; INCOME OPPORTUNITY REALTY INVESTORS, INCORPORATED; AMERICAN REALTY INVESTORS, INCORPORATED; TRANSCONTINENTAL REALTY INVESTORS, INCORPORATED; PILLAR INCOME ASSET MANAGEMENT, INCORPORATED; STEVEN A. SHELLEY; DANIEL J. MOOS; GENE S. BERTCHER; LOUIS J. CORNA,

> Defendants - Appellees

---

Appeal from the United States District Court
for the Northern District of Texas

---

Before HIGGINBOTHAM, DENNIS, and CLEMENT, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

The question posed is whether contractual payments due during a required sixty-day notice period prior to termination of contractual rights here constitute "assets" under the Texas Uniform Fraudulent Transfer Act's broad definition. We are persuaded that they do and reverse dismissal of the TUFTA claims and remand for further proceedings.

No. 15-10881

I.

Prior to April 2011, Prime Income Management, LLC ("Prime LLC") served as a contractual advisor[1] to three publicly traded real estate companies (collectively "the Publics").[2] Prime LLC had no employees or assets. Its parent company, Prime Income Management, Inc. ("Prime Inc."), provided services on behalf of Prime LLC, and received payments due under the Advisory Agreements Those Agreements provided that they were only assignable by mutual consent and that the Publics were required to give sixty days' written notice to Prime LLC before terminating the Agreements in order to avoid penalty.

Prime LLC also guaranteed a commercial real-estate loan held by Plaintiff Hometown's predecessor-in-interest.[3] In late 2010, Hometown's predecessor learned that the borrower had missed monthly payments and demolished a portion of the property securing the loan in violation of the note's terms. Hometown then posted the property for a non-judicial foreclosure sale. Shortly before the scheduled sale, Prime LLC transferred the property to another affiliated entity, EQK Bridgeview Plaza, Inc., which promptly filed for Chapter 11 bankruptcy protection, halting the proceedings.

In March 2011, a bankruptcy court lifted the automatic stay, allowing the foreclosure to proceed. Hometown then sued Prime LLC as guarantor on the loan, obtaining a judgment for the foreclosure deficiency in the amount of

---

[1] The contracts were worth millions of dollars annually.

[2] The Publics consist of: (1) American Realty Investors, Inc. ("ARL"); (2) Transcontinental Realty Investors, Inc. ("TCI"); and (3) Income Opportunity Realty Investors, Inc. ("IOT").

[3] *See Hometown 2006-1 1925 Valley View, L.L.C. v. Prime Income Asset Mgmt., L.L.C.*, 595 F. App'x 306, 307 (5th Cir. 2014). The original loan was held by Plaintiff's predecessor-in-interest. *Id.* at 308.

"Hometown" refers to Hometown 2006-1 1925 Valley View, LLC.

$2,087,464.78.[4] In April 2011, Defendants created Pillar Income Asset Management, Inc. ("Pillar"), an entity owned, controlled, and operated by the same individuals and entities that owned, controlled, and operated Prime LLC. The Publics then terminated their contracts with Prime LLC[5] without giving the required sixty-day written notice, and Prime LLC did not object.[6] According to testimony from Defendant Gene Bertcher, although the Publics "initiated" the termination of their Agreements with Prime LLC, the decision "was by mutual consent" of Prime Inc. and the Publics. Upon termination of the Agreements, the Publics immediately entered into substantially identical contracts with Pillar.

On January 9, 2013, the Publics and Pillar filed a declaratory judgment action in Nevada state court against Prime LLC, Prime Inc., and Hometown, seeking a declaration that the Publics and Pillar were not the alter egos of Prime LLC and Prime Inc. Hometown removed the Nevada action to the United States District Court for the District of Nevada on February 20, 2013.

Asserting that it was unable to collect on its judgment, Hometown filed the instant action against Prime LLC as well as: (1) Prime Inc.; (2) the Publics; (3) Pillar;[7] and (4) individual defendants who served as officers or directors of Prime LLC—and held the same or substantially similar positions in Prime Inc. and the Publics[8]—asserting claims for fraudulent transfer under the Texas

---

[4] This Court affirmed that judgment in December, 2014. S*ee Hometown*, 595 F. App'x at 306.

[5] Each of the Publics disclosed this termination to the SEC.

[6] Plaintiff argues that the money that the Publics would have paid Prime LLC during this sixty-day period—had both parties continued to perform—would more than cover the judgment against Prime.

[7] Pillar presently serves as "contractual advisor" to the Publics.

[8] The individual defendants are: (1) Steven A. Shelley, Vice-President of Prime LLC, Prime Inc., and the Publics; (2) Daniel J. Moos, President and Chief Executive Officer of Prime LLC and the Publics, and President of Prime Inc.; (3) Gene S. Bertcher, Chief Financial Officer of Prime LLC and the Publics, and Chief Administrative Officer of Prime Inc.; and (4)

No. 15-10881

Uniform Fraudulent Transfer Act ("TUFTA"),[9] tortious interference with existing contract, alter ego, and assisting and participating in a conspiracy. Under the first-filed doctrine, the Northern District of Texas transferred this case to the District of Nevada. However, the District of Nevada returned this case—as well as the first-filed suit by the Publics and Pillar—to the Northern District of Texas for two reasons. First, the court found that Defendants' initial Nevada filing was "an anticipatory-strike suit and thus the first-to-file rule does not apply." Second, the court found that "considerations of convenience" favored transfer to Texas.[10]

Plaintiff filed its First Amended Complaint in the Northern District of Texas.[11] The district court dismissed the TUFTA claim, finding that "the Advisory Agreements were not 'assets' [covered by TUFTA] and thus no transfer occurred." Plaintiff timely appealed.

## II.

We turn first to the question of our jurisdiction.[12] Defendants challenge Hometown's assertion as to citizenship. Hometown is a Texas limited liability company with one member, U.S. Bank National Association ("U.S. Bank").[13] According to the "'oft-repeated rule' that diversity jurisdiction in a suit by or against [artificial entities other than corporations] depends on the citizenship of 'all [its] members,'"[14] we must look to the citizenship of U.S. Bank to

---

Louis J. Corna, Secretary and Executive Vice President of Prime LLC, Prime Inc., and the Publics. Mr. Moos and Mr. Bertcher continue in substantially the same roles at Pillar.

[9] TEX. BUS. & COM. CODE ANN. §§ 24.001-.013 (West 2016).

[10] The parties agree that the law of Texas governs here.

[11] Plaintiff also requested temporary and permanent injunctions, which were denied "for failure to comply with the local briefing requirements."

[12] *Wagner v. United States*, 545 F.3d 298, 300 (5th Cir. 2008).

[13] U.S. Bank is successor by merger to Bank of America, National Association, which was successor by merger to LaSalle Bank National Association. LaSalle was the original indenture trustee and sole member of Hometown LLC. *Id.*

[14] *Carden v. Arkoma Assocs.,* 494 U.S. 185, 195-96 (1990) (quoting *Chapman v. Barney,* 129 U.S. 677, 682 (1889)).

No. 15-10881

determine Hometown's citizenship. There is no dispute that U.S. Bank is a national bank with citizenship in Ohio.[15]

Defendants argue that our inquiry does not stop there; citing to *Americold Realty Trust v. Conagra Foods, Inc.*,[16] Defendants reason that since U.S. Bank in its capacity as a trustee is the sole member of Hometown, the citizenship of the "members"[17] of that trust ought be accounted for. We disagree. *Americold* involved a Maryland Real Estate Investment Trust, nominally a trust but in reality an unincorporated business entity recognized by statute.[18] For traditional trusts, the *Americold* court held that "when a trustee files a lawsuit or is sued in her own name, her citizenship is all that matters for diversity purposes."[19] We need look no further than U.S. Bank's citizenship to conclude that Hometown is a citizen of Ohio.

The parties agree that Defendants are citizens of Nevada and Texas. On appeal, Defendants also assert that Mr. Moos is a citizen of Louisiana because his principal residence is there.[20] Regardless, the parties are diverse if all defendants are citizens of states other than Ohio. This Court has subject matter jurisdiction.

### III.

Hometown next argues that the district court should not have dismissed its TUFTA claims under Rule 12(b)(6); that the finding that Prime LLC's

---

[15] 28 U.S.C. § 1348 ("All national banking associations shall, for the purposes of all other actions by or against them, be deemed citizens of the States in which they are respectively located.").

[16] 136 S. Ct. 1012 (2016).

[17] "Traditionally, a trust was not considered a distinct legal entity, but a 'fiduciary relationship' between multiple people." *Id.* at 1016. Trusts do not have "members," rather a trust exists where a settlor transfers title of property to a trustee to hold in trust for the benefit of beneficiaries.

[18] *Id.* at 1015-16.

[19] *Id.* at 1016 (citing *Navarro Savings Ass'n v. Lee,* 446 U.S. 458, 462-66 (1980)).

[20] As they concede, "the record below was not fully developed with respect to this issue."

Advisory Agreements were not assets under TUFTA was in error. Reviewing *de novo*,[21] we must affirm if, assuming the factual allegations in the complaint true,[22] Hometown has "fail[ed] to state a claim upon which relief can be granted."[23] In our review, we may consider the content of the Advisory Agreements,[24] as well as the Publics' SEC filings,[25] in addition to the pleadings.

Hometown alleges that Defendants fraudulently transferred the Advisory Agreements to Pillar in violation of TUFTA. TUFTA defines "transfer" broadly to include "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset."[26] "Asset" is defined under TUFTA as "property of a debtor;"[27] "property" in turn is defined as "anything that may be the subject of ownership."[28] The district court determined that "the Advisory Agreements were not 'assets' and thus no transfer occurred."

In dismissing the TUFTA claims, the district court relied heavily on two bankruptcy cases from the Seventh Circuit. In *In re Commodity Merchants, Inc.*, the Seventh Circuit considered whether a cancelled commodity contract constituted a fraudulent transfer.[29] The court noted that the cancellation was

---

[21] *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (dismissal under Rule 12(b)(6) reviewed *de novo*); *Lightbourn v. Cty. of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997) (conclusions of law reviewed *de novo*).

[22] *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009).

[23] FED. R. CIV. P. 12(b)(6).

[24] *Sullivan v. Leor Energy, LLC*, 600 F.3d 542, 546 (5th Cir. 2010) (quoting *Scanlan v. Tex. A & M Univ.*, 343 F.3d 533, 536 (5th Cir. 2003)) (courts may consider documents attached to a motion to dismiss that "are referred to in the plaintiff's complaint and are central to the plaintiff's claim.").

[25] *Cinel v. Connick*, 15 F.3d 1338, 1343 n.6 (5th Cir. 1994) (courts may consider matters of public record "[i]n deciding a 12(b)(6) motion to dismiss").

[26] TEX. BUS. & COM. CODE ANN. § 24.002(12).

[27] *Id.* § 24.002(2).

[28] *Id.* § 24.002(10).

[29] 538 F.2d 1260 (7th Cir. 1976).

pursuant to a common provision, triggered when "[the bankrupt's] financial position became unsatisfactory."[30] The Seventh Circuit agreed with the conclusion of the bankruptcy court that the contracts had been terminated in good faith and pursuant to their legally enforceable terms.[31] Observing that "[t]he essence of a transfer is the relinquishment of a valuable property right,"[32] and as the bankrupt had no right to the commodities at issue when the contracts were terminated, the court concluded there was no transfer of a property right.[33] The court also found that, cancellation aside, the contracts were not freely assignable and had no market value in light of the termination provisions,[34] so that their cancellation could not sustain a claim of fraudulent transfer.[35]

Similarly, in *In re Wey*, the Seventh Circuit dealt with the forfeiture of the bankrupt's down payment as part of a contract for the sale of real property.[36] After a sizeable down payment for the purchase of a hotel in the U.S. Virgin Islands, the bankrupt purchaser could not pay the balance at closing.[37] Per the terms of the sale contract, the bankrupt forfeited his deposit.[38] The trustee in bankruptcy attempted to have the contract forfeiture set aside as a fraudulent transfer.[39] Citing *Commodity Merchants*, the Seventh Circuit held that "[w]hen a termination is pursuant to the terms of a contract, there is no transfer."[40]

---

[30] *Id.* at 1262.
[31] *Id.*
[32] *Id.* at 1263.
[33] *Id.*
[34] *Id.* at 1263-64.
[35] *Id.* at 1264.
[36] 854 F.2d 196 (7th Cir. 1988).
[37] *Id.* at 198.
[38] *Id.*
[39] *Id.*
[40] *Id.* at 199 (citing *Commodity Merchants*, 538 F.2d at 1063).

No. 15-10881

We agree. The rub is that the contracts here were not freely terminable. Rather, the Advisory Agreements provided for termination without cause upon sixty days' written notice. Plaintiff asserts that Prime's termination of the Agreements in disregard of the sixty-day notice term effected a transfer; that income under the Advisory Agreements would have otherwise been paid to Prime LLC during the sixty-day notice period, a future income stream asset under TUFTA's broad definition. Defendants reply that, because "[t]he right to income under the Advisory Agreements did not vest until the services were performed," future compensation under the contracts had not yet vested and could not constitute a TUFTA asset.

Defendants' reading misstates the contracts' compensatory scheme, reading the sixty-day notice provision as a superfluity. While other forms of compensation due under the contracts were tied to performance metrics or specific services,[41] the base pay was triggered on the fifteenth day of each month. That amount would have been due and payable at least once during the sixty-day notice period, subject only to Prime's continued good-faith performance of its contractual duties. Waiver of the sixty-day notice period effected a transfer of the right to continue performance under the Agreements and receive the payments due thereunder, payments which had ascertainable value and were sufficiently vested to constitute "assets" under TUFTA's broad definition of "anything that may be the subject of ownership."[42]

This reading is also the most cohesive with other terms in the Agreements. In particular, paragraph 18 provides that "[f]rom and after the

---

[41] For example, mortgage placement fees are only available where the advisor originates or purchases mortgage loans. Likewise, acquisition commissions are only available if the advisor locates, leases, or purchases real property. The agreements also contain provisions for "additional services," which can be compensated pursuant to separate agreements.

[42] TEX. BUS. & COM. CODE ANN. § 24.002(10).

effective date of expiration or termination . . . the Advisor shall not be entitled to compensation for further services hereunder *but shall be paid all compensation accruing to the date of expiration or termination.*" To these eyes, this clause makes it plain that the parties, at the time of contracting, envisioned services—and payment for those services—continuing after notice was given for the sixty days prior to the "effective date of . . . termination." And while nothing in the Agreements bound the Publics to provide opportunities for Prime to generate mortgage placement fees, acquisition commissions, disposition fees, or loan arrangement fees during the notice period,[43] the Agreements did bind the Publics to pay the base compensation whether they allowed Prime to continue to manage their investments or not.[44]

Defendants also argue that the presence of a non-assignment clause renders the contracts valueless. That the contracts themselves are not assignable does not render the stream of income and the opportunity to perform services within the sixty-day notice period valueless. While the presence of the non-assignment clause dampens the market value of the Advisory Agreements, the right to perform and collect revenue during the sixty-day notice period still had value and was an asset under TUFTA.

Finally, at oral argument, Defendants suggested that compensation and duties under the Advisory Agreements terminated as soon as notice of termination was given. But such a reading would render the sixty-day notice requirement surplusage—the notice provision has no work to do if it secures no benefit to the party receiving notice. Texas law requires that, in interpreting

---

[43] We do not address the other measures of compensation laid out in the Agreements. Whether, for example, mortgage loans were originated or purchased earlier in the fiscal year, and whether Prime was also entitled to a pro-rata portion of the compensation the Agreements envisioned for such services, are questions we leave in the capable hands of the district court on remand.

[44] Per the Agreements, the index for the base compensation figure was to be derived from the "Average Invested Assets of the Company during the preceding month."

contractual provisions, "courts should 'examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless.'"[45] Reading the Advisory Agreements in their entirety requires that we give effect to the notice requirement. While the value of the notice period lost by failure to adhere to the notice provision remains an issue for further development in the district court, at this stage we think the notice requirement secured measurable economic benefit to Prime. Assuming the facts alleged surrounding this transaction to be true, as we must under Rule 12(b)(6), Plaintiff has alleged an asset, cognizable as such under TUFTA, that was constructively transferred.

We reverse dismissal of the TUFTA claims and remand for further proceedings.

---

[45] *In re Pirani*, 824 F.3d 483, 493 (5th Cir. 2016) (quoting *In re Serv. Corp. Int'l*, 355 S.W.3d 655, 661 (Tex. 2011)).