713 A.2d 527 (1998)
313 N.J. Super. 525
METLIFE CAPITAL FINANCIAL CORPORATION, Plaintiff-Respondent,
v.
WASHINGTON AVENUE ASSOCIATES, L.P. and Lawrence S. Berger, Defendants-Appellants,
and United States of America, Defendant.
Superior Court of New Jersey, Appellate Division.
Argued May 27, 1998.
Decided June 23, 1998.
*528 Lawrence S. Berger, defendant-appellant, pro se and for defendant-appellant Washington Avenue Associates, L.P. (Berger & Bornstein, Morristown, attorneys; Paul H. Schafhauser, on the brief).
Samuel Feldman, Roseland, for plaintiff-respondent (Orloff, Lowenbach, Stifelman & Siegel, attorneys; Mr. Feldman, of counsel and on the brief; Linda S. Moore, on the brief).
*529 Before Judges PRESSLER, CONLEY and WALLACE.
The opinion of the court was delivered by PRESSLER, P.J.A.D.
This controversy arises out of a judgment of foreclosure obtained by the mortgagee's assignee, plaintiff Metlife Capital Financial Corporation. The mortgagor, defendant Washington Avenue Associates, L.P., and its general partner, defendant Lawrence S. Berger, who have since redeemed without prejudice to the bringing of this appeal, challenged plaintiff's calculation of the amount due, asserting that (1) the contracted-for five percent late payment fee had been waived and, alternatively, that it constituted an unenforceable penalty, (2) the default interest rate on the unpaid principal of fifteen percent per annum, 5.45 percent over the contract interest rate of 9.55 percent, constituted an unenforceable penalty, and (3) the mortgagee failed properly to apply the rents it had received after the default under the assignment of rents executed by the mortgagor. The trial judge concluded that the late fee had not been waived and did not constitute a penalty; that the fifteen percent default rate did constitute a penalty but that 12.55 percent, namely, three percent over the contract rate, would be fair and equitable; and that the rents received by the mortgagee had been properly applied. The mortgagor appeals from all adverse decisions, challenging as well the judge's fixing of a default rate. The mortgagee has not cross appealed from the determination that the fifteen percent default interest rate constituted a penalty. We reverse and remand.

I.
In March 1992, plaintiff's predecessor in interest, Metlife Capital Corporation,[1] granted defendants a four-year, 9.55 percent loan in the amount of $1,500,000 secured by a mortgage on commercial property in Belleville. The loan was to be repaid on the basis of a twenty-year amortization by way of forty-eight equal monthly payments of $14,030.98 each, with a so-called balloon payment of $1,391,236.90 due at the end of the fouryear term. The promissory note provided that "a late fee equal to the lesser of five percent (5%) of the delinquent payment or the highest late charge permitted by law shall be payable with respect to any payment which is not paid within ten (10) days of the date on which it was due." It also provided that on a declaration of default, the interest rate on the unpaid principal balance would not be the contract rate but rather an enhanced default rate. The default rate was defined as "the greater of five percent (5%) per annum in excess of the `prime rate' as designated by Chase Manhattan Bank, N.A., from time to time, or fifteen percent (15%) per annum; provided, however, that such Default Rate shall not exceed the maximum rate allowable under law." In addition to payment of the late charge and the default interest rate, the mortgagor was also responsible, upon default, for "all costs of collection including, but not limited to reasonable attorneys' fees (and appellate counsel fees) actually incurred, whether or not suit is filed." Finally, as part of the loan documents, defendant made a present assignment of rents due, which further provided that upon default by the mortgagor,
Grantee [Metlife] may enter upon and take possession of the Property, or any part thereof or, in its own name, sue for or otherwise collect such Rents including those past due and unpaid, and apply the same, less costs and expenses of the operation of the Property, of the performance of Grantor's obligations under any lease thereof, and of collection, including attorneys' fees (together with appellate counsel fees, if any), to the payment of any of the Secured Obligations, in such order as Grantee may determine.
At the time the loan was made, the mortgaged premises were leased by defendants to Walgreen Eastern Co., Inc., under a thirtyyear lease that commenced in July 1988. The monthly rent for the first five years of the term was $16,758.75, and the monthly *530 rent for the second five years of the term was $17,543.28. The rent, therefore, was at all times during the life of the loan, greater than defendants' monthly mortgage payment.
Defendants made all forty-eight pre-balloon payments, albeit forty of them were made late. The record does not indicate how late each of these forty payments were. All that appears are five deposit slips for the latter months of the term showing that for those five months, two of the payments were timely, one was made two days beyond the ten-day grace period, one four days beyond the grace period and one six days beyond the grace period.
In any event, upon the expiration of the four-year term, defendants failed to make the balloon payment, which was due on April 1, 1996. Accordingly, Metlife declared the note in default and began collecting the rent directly from the tenant. It then commenced this foreclosure action by complaint filed in July 1996, and defendants filed a contesting answer. In December 1996, Metlife moved for summary judgment striking the answer, directing that the matter proceed as an uncontested action pursuant to R. 4:64-1, and striking defendants' counterclaim as non-germane, see R. 4:64-5. Concluding by written opinion that the only germane issues raised by defendants were their challenges to the five percent late fee and the fifteen percent default rate and, hence, that there was no genuine contest to the validity or priority of the mortgage or to Metlife's right to foreclose, see R. 4:64-1(a)(2), the court granted the motion, subject, however, to an evidential hearing to determine "whether the amount due on the Mortgage shall include late fees and the default rate of interest provided under the Note and Mortgage." In limiting the disputed issues to defendants' claims that the late fee and default rate constituted unenforceable penalties, the court had also rejected, as unsupported by the motion record, defendants' assertion that Metlife had waived the late fee during the four-year term of the loan.
The evidential hearing provided for by the summary judgment order was held in February 1997. The position taken by defendants was that both the late fee and the default rate were entirely unrelated to any anticipated or actual compensatory damages suffered by Metlife as a result of the late payments and the default and, hence, constituted unenforceable penalties. Metlife, asserting that the late fee and default rate were reasonable and valid liquidated damages provisions because of the difficulty of ascertaining actual damages, produced one of its investment portfolio managers, Barbara Geer, the import of whose testimony was an attempt to explain the nature of Metlife's compensatory damages resulting from both the late payments and the default on the payment of principal. Defendants produced the rebutting testimony of an experienced bank loan officer. We will refer with specificity to the testimony of both hereafter. Suffice it to say at this point in the procedural history that following the hearing, the court sustained the late fee as reasonable liquidated damages. As to the default rate, it concluded that the fifteen percent default interest rate was in the nature of a penalty but that a default rate of 12.55 percent would be reasonably related to actual damages. The court therefore fixed the default rate at that figure, thus adding three percent to the contract rate. It is important, moreover, to note that Metlife's original claim was not only for five percent of each of the forty late monthly installments and the fifteen percent default rate, but also for the five percent late fee on the final defaulted balloon payment of almost $1.4 million for an additional charge of about $69,000. The court was not, however, required to rule on that claim, since it was withdrawn by Metlife during the course of the hearing.
A conforming order was entered following the evidential hearing referring the matter to the Foreclosure Unit of the Superior Court Clerk's Office for entry of final judgment of foreclosure. The order provided for inclusion in the amount due of late fees totalling $28,062, referable to the forty late payments, and for interest on the defaulted principal from March 1, 1996 at 12.55 percent. In support of its request for entry of final judgment, Metlife then filed the required proof of amount due by certification of Geer with the sums calculated as of March 31, 1997. See R. 4:64-2. In addition to the *531 principal balance, the 12.55 percent default rate thereon[2] and the accumulated five percent late fees, the proof also claimed that Metlife had, after the default, paid three quarterly installments of real estate taxes on which it also claimed to be entitled to the 12.55 percent default rate. Finally, the proof accorded defendants a credit of $188,615.50 "for amount collected by plaintiff from Tenant." There was no other information given respecting those rent collections. The total amount of the claim set forth in the proof was $1,452,183.91, inclusive of all charges and credits.
Defendants, upon receipt of the proof, wrote to the Foreclosure Unit objecting to the rent-credit calculation and demanding an accounting of the rents. The letter was, however, received after the final judgment of foreclosure had been entered in accordance with the filed proof. Accordingly, defendants moved the court pursuant to R. 4:50-1 for relief from judgment in order to raise the issue of the proper rent credits. The trial judge considered the application but rejected it based on his finding that the rents collected under the assignment had been properly applied to the debt.
Defendants then filed their notice of appeal, challenging the trial court's determination with respect to the late fees, the default interest rate and the application by Metlife of the rents it collected. As we understand the representations of the parties, while the appeal was pending, defendants paid the obligation in accordance with the judgment of foreclosure and regained the property. The financial disputes, however, continue. And, as we have noted, Metlife did not cross appeal from the court's rejection of the fifteen percent default rate as a penalty.

II.
We address first defendants' claim that Metlife waived the five percent late fee. In sum, we reject that claim for the reasons stated by the trial judge in his oral opinion of January 21, 1997, granting Metlife's original motion for summary judgment. Our review of the record satisfies us that defendants failed to demonstrate a prima facie case of waiver sufficient to defeat a motion for summary judgment under the standard prescribed by Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 666 A.2d 146 (1995). There were insufficient assertions to support the contention that Metlife was either a party to, had approved of, or had agreed to the lock-box arrangement and had thereby acceded to the resultant late payments. Nor do we find any other conduct of Metlife that could reasonably support the contention that it had intentionally waived the late fee or that defendants had relied on any such waiver.

III.
We do, however, find considerable merit in the remainder of defendants' contentions. We consider first the question of the rents collected by Metlife under the assignment of rents after the default. As we have noted, there was never an accounting of rents by Metlife other than the notation on the proof of amount due that defendants were entitled to a credit for the designated sum, although it does appear that Metlife did collect the rent monthly from Walgreen's during the ten-month period between the declaration of default and the closing date of the filed proof. There is no information in the record, however, as to whether Metlife incurred any expenses in effecting this collection beyond the cost of giving the appropriate notice to Walgreen's or whether Metlife, in according the credit, reduced the gross rents collected by any expenses it may have incurred.
The issue before us is whether giving a credit for the accumulated amount of rent collected over a ten-month period without *532 either having applied the rent against the defendants' obligation as it was collected or crediting defendants at some point with interest on the rents collected satisfied Metlife's obligation "to apply the [rents], less costs and expenses ... to the payment of any of the Secured Obligations, in such order as Grantee may determine." We are persuaded that Metlife's apparent "tail-end" application of collected rents against the loan without a crediting of interest thereon was in derogation of its contractual undertaking and in derogation of the implied covenant of good faith and fair dealing that inheres in every contract. Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 420, 690 A.2d 575 (1997); Onderdonk v. Presbyterian Homes of N.J., 85 N.J. 171, 182, 425 A.2d 1057 (1981).
Defendants do not dispute that the assignment of rents made by them as part of the mortgage documents was a present assignment or that Metlife had the right to collect the rent upon declaration of the default and to deduct therefrom the costs of collection, of maintaining the property, and of paying any obligations of the mortgagor in respect of the tenancy. Metlife's right to the rents is clear. But concomitantly, Metlife also had obligations with respect to those collections. It was required to account for them by applying to the loan the net amount collected after the deduction of legitimate expenses. See generally Eisen v. Kostakos, 116 N.J.Super. 358, 368-369, 282 A.2d 421 (App.Div.1971); Orange Land Company v. Bender, 96 N.J.Super. 158, 165-166, 232 A.2d 679 (App.Div.1967). Although we do not doubt that, under the terms of the assignment, Metlife was free to apply the rents in any order it chose, it was nevertheless obligated to apply them in some fair and reasonable manner.
As we have noted, Metlife never rendered a formal accounting of the rents collected showing dates of collection and deductible expenses, if any. And that failure demonstrates, in our view, the essential flaw in Metlife's methodology. What Metlife did was to accord itself the interest-free use of the money it had collected on the mortgagor's account at the same time that it was charging the mortgagor the enhanced default interest rate on the entire principal balance on a daily basis. After all, Metlife is in the money business. The predicate of the money business is the charge for the use of money. It is anomalous in the extreme and, in our view, a failure of good faith and fair dealing, for the mortgagee to insist on full, if not exaggerated, payment by the mortgagor for the use of its, the mortgagee's, money, but to decline to pay the mortgagor, by an appropriate credit, for the use of money that, if not technically the mortgagor's, is functionally the mortgagor's and for which the mortgagor is entitled to a credit. Illustrative of what we perceive to be the essential unfairness of Metlife's conduct was the manner in which it addressed the advances for taxes. It treated the direct tax payments it made after the default as further advances to the mortgagor on the loan. Although it had collected rents sufficient to pay the taxes, it chose not to apply the rents to that obligation of the mortgagor but instead, while retaining the interest-free use of the rents, advanced the taxes against the loan and charged the mortgagor the post-default rate of 12.55 percent on those advances. The point, of course, is that while Metlife was free to apply the rents in any order it chose, it was not applying them at all, but was, rather, continuing to charge the mortgagor interest on the entire debt while at the same time making interestfree use of the collected rents.
We recognize, as pointed out by Osborne, Mortgages (2d ed.1970), § 165 at 286-287, quoted in Eisen v. Kostakos, op. cit., supra, 116 N.J.Super. at 369, 282 A.2d 421, that there may be situations in which the mortgagee's collection of rents must be offset by substantial, complex, and not immediately determinable expenses and other primary obligations of the mortgagor and, hence, that a periodic calculation of the rent credit cannot readily be made and a determination of the ultimate set-off to which the mortgagor is entitled must await a final accounting. In that situation, it may well be that in collecting the rents, the mortgagee is not actually obtaining the interest-free use of money. However, that hardly appears to be the case here, and we understand the representations made by Metlife's counsel at oral argument at least to suggest that it merely collected *533 the rents, had them available for use for its own purposes unrelated to the secured loan as they were collected, and credited defendant in the proof of amount due ten months later with the gross amount collected. If that is indeed the case, we are persuaded that equitable principles require Metlife to pay for the use of that money for the period during which the funds were so available to it by according defendants an appropriate credit against the total obligation due.
This matter requires further consideration by the trial court. Metlife must provide a full accounting to defendants for the rents collected, showing the dates and amounts of collection and the dates and amounts of any offsetting related expenses. The trial judge should then, based on those facts, determine whether Metlife in fact had the interest-free use of money for which it was obliged to account to defendants, and, if so, how much money and for how long a period of time. Based on equitable principles, the trial judge should then determine how much interest, if any, on that amount of money is owed as an offsetting credit to defendants.
We are also advised that defendants have instituted a separate action against Metlife seeking an accounting of rents Metlife collected between the date of the proof of amount due and the date of defendants' redemption. That action should be consolidated with this one on the remand and the entire rent-collection dispute proceeded with in a single litigation in the trial court.

IV.
We next address defendants' argument that the five percent late fee is an unenforceable penalty and Metlife's counter-assertion that it is simply a reasonable liquidated damages clause. The standards for determining when a purported liquidated damages clause constitutes an unenforceable penalty have long been well-settled in this jurisdiction. As this court stated nearly thirty-five years ago in Westmount Country Club v. Kameny, 82 N.J.Super. 200, 206, 197 A.2d 379 (App.Div. 1964), relying on Restatement of Contracts § 339 (1932):
An agreement made in advance of breach, fixing the damages therefor, is not enforceable as a contract and does not affect the damages recoverable for the breach, unless (a) the amount so fixed is a reasonable forecast of just compensation for the harm that is caused by the breach, and (b) the harm that is caused by the breach is one that is incapable or very difficult of accurate estimate. (Citations omitted.) However, if it appears that the parties have provided for an excessive sum in a case where the real damages are certain or readily reducible to certainty by proof, then the sum fixed is deemed a penalty and is not enforceable. (Citation omitted.)
In the intervening years, the original Restatement was replaced by the Restatement (Second), but the principle remained the same. Thus the Restatement (Second) of Contracts § 356(1) (1981) provides that:
Damages for breach by either party may be liquidated in the agreement but only at an amount that is reasonable in the light of the anticipated or actual loss caused by the breach and the difficulties of proof of loss. A term fixing unreasonably large liquidated damages is unenforceable on grounds of public policy as a penalty.
The Restatement (Second) position has been fully endorsed and adopted by the New Jersey Supreme Court in Wasserman's Inc. v. Middletown, 137 N.J. 238, 252, 645 A.2d 100 (1994), which noted, moreover, the consistency between theRestatement (Second) and the Commercial Code, N.J.S.A. 12A:2-178, which provides that:
(1) Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in the light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy.
See also Stuchin v. Kasirer, 237 N.J.Super. 604, 613, 568 A.2d 907 (App.Div.), certif. denied, 121 N.J. 660, 583 A.2d 346 (1990); Barr & Sons, Inc. v. Cherry Hill Center, Inc., 90 N.J.Super. 358, 376-377, 217 A.2d 631 (App.Div.1966).
*534 The question before us then is twofold: first, whether the five percent late charge provided for by the promissory note is reasonably related to the anticipated or actual damage likely to be suffered by the lender in the event of late payment of the installment due and, second, whether those damages are unascertainable or difficult to prove resulting in the inconvenience or non-feasibility of otherwise obtaining a remedy. Unless both components of that question can be answered affirmatively, the late charge cannot pass muster as an enforceable liquidated damages provision. The answer to that question depends, moreover, on the proofs offered by the parties at the evidential hearing.
Before considering those proofs, we make this preliminary observation. As the Court made clear in Wasserman's, supra, 137 N.J. at 252, 645 A.2d 100, the "recent trend toward enforcing stipulated damages clauses" engenders the presumption of their reasonableness, casting upon the party challenging the clause the burden of proving unreasonableness. The trial court here imposed that burden on Metlife, another ruling from which it has not cross appealed. We regard, however, the misplacing of the burden as inconsequential. Neither party has suggested to us the availability to it of any further proofs or of any effect the misplacement of the burden may have had on trial strategy. Moreover, the factual proofs were largely undisputed. We are, therefore, satisfied that considering the record as a whole and irrespective of the placement of the burden of proof, the unreasonableness of the stipulated damages of five percent of the installment due as a late fee was clearly demonstrated. It is an unenforceable penalty.
We consider the trial proofs in the context of these further observations. First, the stipulated damages for breach of the borrower's obligation to make timely monthly payments is expressed only in terms of a fixed percentage of the installment duethat is, five percentwithout any reference to or consideration of the duration of the breach and without any reference to the amount of the late installment. Thus, the same five percent applies whether the late installment was $1,000 or $10,000 or $100,000 and whether it was one day late or thirty or sixty. It appears to us, therefore, that in order for the late charge to constitute a reasonable stipulated damages provision as a matter of presumptive validity, it would have to appear that the anticipated or actual damage suffered by the lender in the event of a late payment is unrelated to the duration of the breach, and it would also have to appear that the anticipated or actual damages have a material relationship to the amount of the installment since the amount of the late charge is a function only of the amount of the installment. We address the proofs in that light.
Justification for the five percent late charge as liquidated damages was offered by Geer, Metlife's portfolio management specialist, who testified that the five percent late charge is the industry standard and custom. She also testified as to the elements of Metlife's actual damages resulting both from late payments and from default but without in any way attempting to quantify any of those elements. The purpose of the late charge, she explained, is "to assist with costs which are associated in collecting these late payments, internal costs." While no actual costs were testified to, the internal activities generated by the late payment consist, according to Geer, of sometimes but not always telephoning or writing to the borrower and entering the relevant information in computer programs whose printouts are sent to the real estate department and senior management. Thus
Delinquent monthly payments are administered by a department set up to ask and call for such payments that are delinquent. They administrate, they hire a number of people to make calls and write letters inin an attempt to collect the payment that is delinquent.... In addition to the personnel making phone calls at various times during the month trying to collect the payment, there are reporting requirements and monitoring requirements that have to be met to other departments, especially the accounting department and senior management and reporting requirements to the real estate *535 department.... They have to notify senior management and the real estate department exactly as to why the payment is late, if they've been able to reach the customer, if they've not been able to reach the customer. You know, have they sent out letters. Have they verified whether there are other accounts that are delinquent with this customer. They report to, on a monthly basis, the number of delinquency for a customer, and an attempt to contact them, what they've done. They have to report to the legal department and senior management in real estate and accounting. They have to track numbers for all accounts. Payment. Dollar amounts. Total loan amounts.
She also testified on cross examination that,
I don't know of any actual costs [incurred by Metlife in the event of a late payment] other than the taking into consideration that there are a lot of them that are not cannot pinpoint, based on certain internal costs. And some of them that arethey have done some internal costs calculations, I know, for other Courts that I've appeared in, but it hasn't been able to be totally conclusive based on employment, and other requirements to administer these loans.
While Geer herself could not testify to the activities undertaken by the recipients of the printouts and other such reports, she presumed that senior management used them to evaluate the productivity of the loan and to determine whether litigation or other enforcement techniques should be employed. Of course, it is also clear to us that at least one other purpose of the data entries on late payments is to generate the information necessary to bill the borrower for the late fee. And although Geer did not so testify in connection with the late fee, there is also the factor to be considered of the lender's loss of the full productivity of the loan by reason of having to wait for the payment, which, had it been timely made, would have provided the lender with those additional days of investment opportunity.
It is difficult for us to understand quite how Geer's testimony provides an adequate basis for sustaining the reasonableness of the customary five percent fee. There is nothing in Geer's testimony to suggest that the unquantified internal costs, even if we assume that they are reasonably recoupable and are not merely a matter of the cost of doing business, are necessarily related to the amount of the loan or of the installment. Indeed, her testimony appeared to be to the contrary. Yet, even though all borrowers who make a late payment would, in that case, inflict the same amount of damages on the lender irrespective of the amount of the installment due, nevertheless each borrower pays different stipulated damages depending only on the amount of the installment. It would appear, therefore, that to the extent that these administrative internal costs represent recoverable damages at all, a reasonable liquidated damage provision would have to be in the nature of a flat fee that would be the same for all borrowers. If, moreover, as may also be inferable from Geer's testimony, the duration and frequency of the delinquencies have a direct relationship to internal administrative costs because those factors might require closer and more constant loan management, the fact remains that the uniform five percent fee does not take these factors into account at all.
To the extent that the late fee might be justified as compensation to the lender for the loss of the productivity of the loan, it is patent that the five percent late fee is wholly unsupportable and probably usurious.[3] The same five percent is charged whether the installment is one day late or thirty days late. And if it is one day late, the annualized interest rate on that delinquent installment would be 1825 percent. Moreover, if the purpose of the late fee were, in fact, to compensate the lender for loss of the use of that money for the period of the delinquency, we think it plain that that element of damage is neither unascertainable or difficult to prove. The annual contract interest or any other reasonable rate is readily calculable on a per diem basis, and the actual loss, as determined by applying the per diem rate to the duration of the lateness, could readily be *536 added to the borrower's next monthly statement. Stipulated or liquidated damages would not be necessary or appropriate. See, e.g., Borden Company, Pioneer Ice Cream Division v. Manley, 127 N.J.L. 461, 463, 23 A.2d 281 (Sup.Ct.1942) ("[i]f it appears that the parties have provided for an excessive sum in a case where the real damages are certain or readily reducible to certainty by proof, then the sum fixed is deemed a penalty and not enforceable.")
We are thus persuaded that the five percent late charge fails to meet the liquidated damages test for two reasons. First, there was no showing on any quantified basis, and hence it is a matter of pure speculation, that the fixed percentage late fee is reasonably related to the anticipated or actual internal costs. Beyond that, at least some of the legitimate elements of damage are not either unascertainable or difficult to calculate. There is, however, yet another reason for our conclusion. Geer did not testify that one of the purposes of the late charge was coercive, that is, to provide an incentive to the borrower, on pain of incurring the late charge, to make timely payments. But we are convinced that such a purpose may be inferred. Certainly such a purpose explains the percentage technique since it imposes the same relative pain on each borrower, a result that would not obtain if the same modest flat service fee were charged on each loan. But it is well settled that a purpose to coerce timely payments renders the charge so imposed a penalty by definition. See, so holding, Stuchin, op cit., supra. See also In re Tasty east, Inc., 126 F.2d 879, 882 (3rd Cir.), cert. denied sub nom. Modern Factors Co. v. Tastyeast, Inc., 316 U.S. 696, 62 S.Ct. 1291, 86 L.Ed. 1766 (1942); In re Timberline Property Development, Inc., 136 B.R. 382, 385-86 (D.N.J.1992); Ridgley v. Topa Thrift and Loan Ass'n, 17 Cal.4th 970, 73 Cal.Rptr.2d 378, 953 P.2d 484, 490 (1998). As explained by Garrett v. Coast and Southern Federal Sav. & L. Ass'n., 9 Cal.3d 731, 108 Cal.Rptr. 845, 511 P.2d 1197, 1203 (1973), in assessing the punitive nature of the fixed percentage late charge there involved:
We are compelled to conclude that a charge for the late payment of a loan installment which is measured against the unpaid balance of the loan [there two percent] must be deemed to be punitive in character. It is an attempt to coerce payment by a forfeiture which is not reasonably calculated to merely compensate the injured lender.
We reach the same conclusion with respect to a late charge measured by a fixed percentage of the installment due.
There is no reported case in this jurisdiction dealing directly with the question of the penal nature of a fixed percent late charge. We recognize that the issue was raised in Crest S. & L. Ass'n v. Mason, 243 N.J.Super. 646, 648-649, 581 A.2d 120 (Ch. Div.1990), in which the court did note that:
Late payment charges, or late charges, are collectable as liquidated damages if there is a provision for them in the mortgage instruments. When there is such a provision, an issue may arise as to whether the late charge constitutes valid liquidated damages or an invalid penalty. If the late charge is compensation to the mortgagee for its administrative expenses and the cost of money wrongfully withheld, it is a proper charge as liquidated damages.
Nevertheless, the court did not have to address the issue of whether the five percent late fee there was a penalty or not since the parties only disputed the collectibility of the late charge imposed on payments due after the filing of the complaint in foreclosure, a charge held to be invalid.
The validity of the percentage late charge has, however, been considered by other jurisdictions. Some sustain it primarily on the basis of industry custom and standard without factual or legal analysis of its nature or its relationship to anticipated or actual damages. See, e.g., Mattvidi Assoc. Ltd. Partnership v. NationsBank of Virginia, 100 Md. App. 71, 639 A.2d 228, 238, cert. denied, 336 Md. 277, 647 A.2d 1216 (1994), and cases cited therein. See also Gary D. Spivey, Annotation, Validity and Construction of Provision Imposing "Late Charge" or Similar Exaction for Delay in Making Periodic Payments on Note, Mortgage, or Instalment Sale Contract, 63 A.L.R.3d 50, 53 (1975 & Supp.1997). And see Mack Fin. Corp. v. *537 Ireson, 789 F.2d 1083 (4th Cir.1986), holding a five percent late charge valid on the basis of Virginia law expressly authorizing late charges in an amount not exceeding five percent of the amount of the installment due. We find more persuasive, however, the contrary reasoning to which we have already referred of Garrett, supra, (invalidating as a penalty a late charge of two percent of the principle balance); Ridgley, supra, (invalidating as a penalty a late fee of six months' interest); Garcia v. Canan, 851 F.Supp. 327 (N.D.Ill.1994), (invalidating as a penalty a late charge of ten percent of the installment due); and In re Matter of Timberline, supra, (invalidating on the basis of the Bankruptcy Court's understanding of New Jersey law, a late charge, like here, of five percent of the monthly interest installment due).

V.
Finally, we consider the default interest rate of fifteen percent. We start with the proposition that the extra 5.45 percent can be regarded as liquidated damages rather than a penalty only if it meets the two-prong test we have already described. See Stuchin, supra, 237 N.J.Super. at 613-614, 568 A.2d 907. We turn again to Geer's testimony. The components of the damages she explained, again unquantified, included internal administrative costs, the loss of the use of the money, and the necessity for Metlife to obtain appraisal and environmental reports and to engage attorneys. What we have said about the internal costs and the loss of the bargain in connection with the five percent late charge obtains to the default interest rate as well. As to the other costs, we note first that attorneys' fees together with all other costs of collection cannot be included as stipulated damages because they are charged separately to the borrower. Geer, indeed, made clear that for that reason no litigation or pre-litigation expenses are taken into account as supporting stipulated damages. Moreover, we think it plain that the cost of obtaining appraisal and environmental reports are neither unascertainable nor difficult to calculate whether or not done in house.
The trial judge, as we have noted, agreed with defendants that the fifteen percent default rate was excessive and not reasonably related to anticipated actual damages, and there was no cross appeal from that ruling. The issue before us, therefore, is whether, after so concluding, the judge properly fixed the lesser default rate of 12.55 percent, that is three percent over the contract rate. We are satisfied that his doing so is not sustainable. In our view, once the trial court has determined that a liquidated damages provision constitutes a penalty and is, therefore, unenforceable, the party who attempted to impose that penalty is remitted to the ordinary recourse of proving actual damages sustained. See Wasserman's, supra, 137 N.J. at 249, 645 A.2d 100. Moreover, we see no factual basis in the record for the fixing of a three percent enhancement as unliquidated damages. On this record, we regard as entirely speculative the conclusion that any unascertainable or difficult to calculate actual damages suffered by Metlife by reason of the default are reasonably related to a three percent enhancement over the contract rate. See also In re Timberline, supra, 136 B.R. at 385, invalidating a three percent default rate enhancement as coercive and, therefore, punitive, and noting that while "it is plausible that a three percent (3%) increase upon default bears some relationship to actual administrative expenses incurred by the lender," the proofs offered by the lender there nevertheless failed to support that conclusion. The same is true here.

VI.
As we have noted, defendants have paid the amount required by the judgment of foreclosure in full. We hold that that sum should not have included either the five percent late charge or the three percent default rate enhancement over the contract rate. We also hold that the issue of defendants' entitlement to credit for the rents collected must be reconsidered consistently with this opinion.
We therefore vacate those provisions of the judgment of foreclosure relating to the calculations of the amount due to the extent the five percent late fee and the 12.55 percent *538 default rate were included, and we reverse the order denying defendants' motion for relief from judgment seeking recalculating of the credit for rents collected. We remand in order that plaintiff may present proof of actual damages sustained by reason of the late payments and the default, for recalculation of the credit for rents collected consistent with this opinion, and for consolidation with this action of any other pending litigation respecting that credit.
NOTES
[1] Since Metlife Capital Corporation, the original mortgagee, and Metlife Capital Financial Corporation, its assignee and the plaintiff here, are obviously related entities, we refer to them interchangeably as either Metlife or plaintiff.
[2] We find no explanation in the record for the fact that the proof of amount due used the 12.55 percent interest rate on the unpaid principal balance from March 1, 1996, although the balance was not due until April 1, 1996. The loan does not appear to have been in default prior to April 1, 1996, particularly since the last of the forty-eight monthly payments was timely made on March 6, 1996; Metlife's notice of default, dated May 9, 1996, referred to April 1, 1996, as the date of the default; the March billing to defendants from Metlife showed the principal balance not due until April 1, 1996; and, finally, the proof itself referred to April 1, 1996, as the default date.
[3] The criminal usury statute, N.J.S.A. 2C:21-19, makes it a crime to charge an individual annual interest at a rate exceeding 30% and a corporation a rate exceeding 50%.