**In re LiTENDA MORTGAGE CORPORATION, Debtor.**

**Barbara A. Edwards, Chapter 7 Trustee for Debtor, LiTenda Mortgage Corporation, Plaintiff,**

v.

**Federal Home Loan Mortgage Corporation d/b/a Freddie Mac, Defendant.**

**Bankruptcy No. 96–40632 (NLW). Adversary No. 98–2881.**

United States Bankruptcy Court, D. New Jersey.

March 29, 1999.

---

David N. Crapo, Gibbons, Del Deo, Dolan, Griffinger & Vecchione, Newark, NJ, for Defendant.

Lawrence M. Rolnick, Steven M. Hecht, Lowenstein Sandler, P.C. Roseland, NJ, for Chapter 7 Trustee.

## OPINION

NOVALYN L. WINFIELD,
Bankruptcy Judge.

THIS MATTER is before the Court on the defendant's motion to dismiss the adversary complaint pursuant to F.R.

Bankr.P. 7012(b)(6) for failure to state a claim on which relief can be granted. In response to the defendant's motion, the Chapter 7 trustee filed a cross motion for summary judgment.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the Standing Order of Reference by the United States District Court of New Jersey dated July 23, 1984. Moreover, this is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(E), (F) and (H). The following represents this Court's findings of fact and conclusions of law pursuant to F.R. Bankr.P. 7052.

## BACKGROUND

### The Parties

The debtor, LiTenda Mortgage Corporation ("LiTenda") is a New Jersey corporation which conducted business as a residential mortgage seller/servicer until it filed for relief under Chapter 7 on November 21, 1996. The plaintiff, Barbara A. Edwards, is the trustee appointed by the United States Trustee to administer the bankruptcy estate ("Trustee"). Theodore and Linda Howard ("the Howards"), the principals of LiTenda, also obtained bankruptcy relief by filing a Chapter 11 petition on August 5, 1996. The defendant, Federal Home Loan Mortgage Corporation ("Freddie Mac") is a federally-chartered corporation "that purchases home mortgages from lenders and sells securities to the public to fund the purchases." *Hudson United Bank v. LiTenda Mortgage Corp.*, 142 F.3d 151, 153 (3d Cir.1998). Freddie Mac was created by Congress to assist in the development and maintenance of a secondary market in conventional residential mortgages.

### Factual History

Freddie Mac does not make loans directly to borrowers. It purchases loans from originating lenders and then contracts with numerous loan servicers who collect borrowers' monthly mortgage payments and take appropriate actions to preserve the property securing the loans Freddie Mac has purchased. The mortgage loan servicers "collect the borrowers payments, maintain all the necessary accounts (including escrow accounts for taxes and insurance) and mak[e] the necessary disbursements (including remittance of principal and interest to the [note holder] and disbursements for taxes and insurance)." *Deerman v. Federal Home Loan Mortgage Corp.*, 955 F.Supp. 1393, 1396 (N.D.Ala.1997), *aff'd*, 140 F.3d 1043 (11th Cir.1998).

LiTenda acted as an approved mortgage seller/servicer for Freddie Mac from 1988 through 1996. As an approved Freddie Mac servicer, LiTenda's services were governed by the terms of the Freddie Mac Single–Family Sellers' and Servicers' Guide (the "Guide") and certain other "purchase documents" as defined in § 1.2(a) of the Guide. Pursuant to § 1.2(a) and (h) of the Guide, the Guide and the related purchase documents constituted the entire contract between LiTenda and Freddie Mac. Pursuant to § 1.2(a), a seller which sells mortgages to Freddie Mac is required to service those mortgages for Freddie Mac in accordance with the standards set forth in the Guide, and the obligation to service mortgages for Freddie Mac is considered to constitute a master servicing contract. A further term of § 1.2(a) provides that a seller agrees that "any failure to service any Mortgage in accordance with the terms of the unitary, indivisible master Servicing contract, or any breach of any of the Seller's obligations ... shall be deemed to constitute a breach of the entire contract and shall entitle Freddie Mac to terminate the contract." Also pursuant to § 1.2(a), a servicer which merely services mortgages that it did not sell to Freddie Mac is subject to the same requirements.

LiTenda claims that at the time of the events that gave rise to this adversary proceeding, the value of its servicing contract for the loans it sold to Freddie Mac exceeded $1,000,000. Further, it asserts

that the proceeds of its servicing activities were its primary source of income.

In October, 1990, LiTenda became the interim servicer for a portfolio of loans from Liberty Mortgage Banking, Ltd. (the "Liberty Portfolio") after Freddie Mac terminated that servicer's contract. The servicing of the Liberty Portfolio was governed by the Guide and an interim servicing agreement which was entered into by Freddie Mac and LiTenda. LiTenda serviced the Liberty Portfolio until April, 1995. The present dispute between LiTenda and Freddie Mac arises from LiTenda's servicing of the Liberty Portfolio.

Freddie Mac claims that LiTenda, as the interim servicer for the Liberty Portfolio, retained funds which it should have remitted to Freddie Mac. According to Freddie Mac, among other things, LiTenda (i) failed to properly calculate its fee for servicing the LiTenda Portfolio, and (ii) failed to properly calculate the principal and interest it collected on the Liberty Portfolio. Freddie Mac asserts that as a consequence of its investigation of the matter it discovered that LiTenda owed it a total of $2,148,116, including $1,362,820.38 in principal and interest collected from the Liberty Portfolio and not remitted to Freddie Mac. Though LiTenda disputes Freddie Mac's characterization of the facts and does not concede the amount claimed by Freddie Mac, it does agree that it accrued a large liability to Freddie Mac. However, LiTenda claims that the obligation accrued because of Freddie Mac's accounting incompetence and its failure to abide by its contractual duties.

To resolve their dispute over the extent of the liability, LiTenda and the Howards entered into a settlement agreement with Freddie Mac (the "Settlement Agreement") on July 31, 1995. In the Settlement Agreement, the Howards specifically acknowledged that LiTenda owed Freddie Mac the amount of $2,148,116 (the "Debt") arising out of its servicing of the Interim Portfolio. Pursuant to the Settlement Agreement, the Howards and LiTenda agreed to pay the settlement amount of $850,000 by making monthly payments of $10,000 for five years, with a balloon payment due at the end of the five year period. According to the Settlement Agreement, the full amount of the original debt would become due and owing if the Howards and/or LiTenda failed to perform its obligations under the Settlement Agreement.

What happened after the settlement is as disputed as the events preceding the settlement. The Howards state that following the settlement, and because of its debt obligations to Freddie Mac and other financial institutions, it decided to explore the sale of LiTenda or its servicing business. It notes that Freddie Mac was informed of its efforts to sell the servicing rights and LiTenda's expectation that Freddie Mac would be fully protected in any sale. In fact, in April, 1996 the Howards provided Freddie Mac with a detailed business plan and financial plan regarding its efforts. LiTenda alleges that within days of receiving its business plan, Freddie Mac created an alleged default of the Settlement Agreement and wrongfully seized LiTenda's servicing portfolio. LiTenda asserts that Freddie Mac accomplished its alleged scheme by performing an unannounced audit of LiTenda on April 29, 1996. LiTenda alleges that the purpose of the audit was to manufacture some cause to terminate LiTenda as a seller/servicer and to trigger a default under the Settlement Agreement.

Freddie Mac's version of the events leading to the April 29, 1996 audit differ markedly from LiTenda's account. It asserts that in the latter part of 1995 and the beginning of 1996 it conducted reviews of the custodial account balances and practices of many of its servicer/sellers, including LiTenda. From its review of LiTenda, Freddie Mac claims that it identified a shortfall of over $400,000 in the tax and insurance custodial accounts which LiTenda maintained for the Freddie Mac portfolio. Freddie Mac asserts that when it

confronted LiTenda personnel about the matter, it was informed that non-Freddie Mac funds were routinely deposited into Freddie Mac custodial accounts, and funds were routinely withdrawn from Freddie Mac custodial accounts for non-Freddie Mac purposes.

Freddie Mac points out that under the Guide, a servicer is required to maintain custodial accounts for funds it receives on behalf of Freddie Mac. (Guide § 76.1.) Furthermore, under the Guide, a servicer must establish two custodial accounts for funds received from servicing the Freddie Mac portfolio: an account for principal and interest payments ("P & I Account") and an account for escrow items such as taxes, hazard insurance, and mortgage insurance payments ("T & I Account"). (Guide §§ 76.3 and 76.4.) Freddie Mac also notes that pursuant to the Guide, only Freddie Mac funds may be maintained in these custodial accounts. *See id.* Finally, Freddie Mac observes that continued compliance with the terms of the Guide was a condition of the Settlement Agreement.

Freddie Mac states that because of LiTenda's conduct regarding the custodial accounts, it conducted the April 29, 1996 audit, as it was authorized to do under § 52.6 of the Guide. Following the audit, Freddie Mac terminated LiTenda's eligibility as a servicer by letter dated May 2, 1996. Freddie Mac contends that the termination was effective as of May 2, 1996, notwithstanding LiTenda's right to appeal pursuant to § 5.4 of the Guide.

LiTenda claims that the Service Agreement was not terminated as of May 2, 1996 because its counsel sent a letter dated May 17, 1996 in which it protested the lack of notice of Freddie Mac's intent to terminate. In its letter, LiTenda also stated that it was not in violation of the terms set forth in the Guide. LiTenda requested that Freddie Mac set forth the factual support underlying its allegations as to LiTenda's breaches of the Guide. Freddie Mac maintains that LiTenda's letter was not an appeal of the termination. Rather,

Freddie Mac contends that the letter merely requested more information as to the reasons for Freddie Mac's decision.

Freddie Mac responded to LiTenda's request for factual support by letter dated June 19, 1996. In its response, Freddie Mac set forth specific transactions, including dates and amounts, along with specific sections of the Guide which Freddie Mac claims led to termination of the Servicing Agreement. In its response of July 3, 1996, LiTenda characterized these alleged violations of the Guide as merely technical, and claimed that they never presented any financial risk to Freddie Mac or its borrowers. LiTenda further advised Freddie Mac that Freddie Mac's termination of LiTenda as a Freddie Mac servicer was wrongful and that the wrongful termination had caused the destruction of LiTenda's business. By letter dated August 1, 1996, Freddie Mac responded to LiTenda's July 3, 1996 letter and denied LiTenda's appeal.

By letter dated October 21, 1996, LiTenda requested further clarification of Freddie Mac's letter of August 1, 1996 which denied LiTenda's appeal. No further response was received from Freddie Mac, and approximately one month later LiTenda filed its bankruptcy petition.

No litigation was initiated regarding the LiTenda seller/servicer contract with Freddie Mac until the Trustee and the Howards initiated a civil suit against Freddie Mac before the United States District Court for the District of New Jersey ("District Court Action"). The District Court Action is for damages which LiTenda suffered by reason of Freddie Mac's alleged wrongful termination of the Servicing Agreement. Approximately six months later, the Trustee filed the instant adversary proceeding.

The factual circumstances of this adversary proceeding are the same as those which underlie the District Court Action. However, in this adversary proceeding, the Trustee styles the relief sought as follows:

(i) turnover of LiTenda's extinguished rights under the Servicing Agreement, and (ii) avoidance of the termination of the Servicing Agreement, which the Trustee characterizes as a preferential transfer under Code § 547(b) or a fraudulent transfer under § 548(a), or N.J.S.A. 25:2–25(b) and 25:2–27(a).

## STANDARD OF REVIEW

■ Freddie Mac moves to dismiss LiTenda's complaint under Rule 7012 of the Federal Rules of Bankruptcy Procedure, which makes Rule 12(b)(6) of the Federal Rules of Civil Procedure applicable to bankruptcy proceedings. Rule 12(b)(6) provides that a motion to dismiss a complaint may be granted for "failure to state a claim upon which relief can be granted." In evaluating a motion to dismiss, the court must accept as true "all well-pleaded allegations in the complaint" and must draw all inferences in the plaintiff's favor. *See Jenkins v. McKeithen,* 395 U.S. 411, 421–22, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); *Blaw Knox Retirement Income Plan v. White Consolidated Indus.,* 998 F.2d 1185, 1188 (3d Cir.1993). The court may not grant the motion to dismiss "unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Commonwealth of Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.,* 836 F.2d 173, 175 (3d Cir.1988); *Altemose Constr. Co. v. Atlantic, Cape May and Parts of Burlington, Ocean and Cumberland Counties Bldg. Trades Council,* 493 F.Supp. 1181, 1183 (D.N.J.1980).

## ISSUE

Freddie Mac seeks dismissal of the Second, Third, Fourth and Fifth counts of the complaint because its disqualification of LiTenda as a seller/servicer and the resultant termination of the Servicing Agreement was not a transfer as that term is defined in the Bankruptcy Code or the New Jersey Uniform Fraudulent Transfer Act. Freddie Mac urges the Court to find that the Trustee cannot employ the law of preferential transfer or fraudulent transfer to revive the Servicing Agreement, which was validly terminated pre-petition. Freddie Mac also argues that the First Count for turnover under Code § 542 fails to state a cause of action on which relief can be granted. It flatly rejects the notion that it wrongfully terminated the Servicing Agreement, and further vigorously denies that termination of the Servicing Agreement amounted to a seizure of LiTenda's property. Accordingly, it claims that since a bona fide dispute exists as to whether LiTenda had a right to continue to service the Freddie Mac portfolio, a turnover action under Code § 542 is inappropriate.

The Trustee, of course, denies that there is any merit in the motion to dismiss and cross moves for summary judgment on all counts of the complaint. The Trustee maintains that the termination of LiTenda as a servicer of the Freddie Mac portfolio was a seizure of its servicing rights, and caused an involuntary transfer of its property interest in the servicing rights. In that regard, the Trustee argues that the property interest that was transferred was LiTenda's right to receive adequate consideration from Freddie Mac for its servicing rights.

## DISCUSSION

### Existence of a Transfer

■ Code § 547(b) sets forth the elements of a voidable preference, allowing bankruptcy trustees to avoid "any transfer of an interest of the debtor in property." The relevant portion of Code § 548 states that "the trustee may avoid any transfer of an interest of the debtor in property." Similarly, to establish a claim for fraudulent transfer under the New Jersey statute, a plaintiff must demonstrate that a voluntary or involuntary transfer was made by a debtor to a creditor.

Thus, a central question which must be addressed is whether termination of a contract, pursuant to the terms of a contract, can constitute a transfer within the meaning of the foregoing avoidance statutes.

For the Trustee to succeed under either Code § 547 or § 548, she must establish that a transfer of LiTenda's property occurred. Pursuant to Code § 101(54), a transfer is defined as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property, including the retention of title as a security interest and foreclosure of the debtor's equity of redemption." The Court agrees with Freddie Mac that notwithstanding the breadth of the foregoing definition, a pre-petition termination of a contract pursuant to its terms and the consequent cessation of a debtor's rights under a contract does not constitute a transfer within the meaning of either Code § 547(b) or § 548(a). *See Matter of Wey*, 854 F.2d 196, 199 (7th Cir.1988); *Matter of Commodity Merchants, Inc.*, 538 F.2d 1260, 1263 (7th Cir.1976); *In re Coast Cities Truck Sales, Inc.*, 147 B.R. 674, 678 (D.N.J.1992); *In re Egyptian Brothers Donut, Inc.*, 190 B.R. 26, 29 (Bankr.D.N.J. 1995); *Matter of Jermoo's*, 38 B.R. 197, 206 (Bankr.W.D.Wis.1984).

Though decided under the Bankruptcy Act, the *Commodity Merchants* case is factually similar to the matter at hand and provides a persuasive analysis of the term transfer as it is used in §§ 547 and 548.[1] In that case the debtor had conducted business as a trader of commodities futures. Archer–Daniels–Midland Company ("ADM") was a participant with the debtor in various commodities transactions. Pri-

or to its bankruptcy, the debtor held four contracts under which it was a purchaser of commodities from ADM, and one under which it was a seller. At the same time, the debtor had an open account with ADM of approximately $45,000 as a result of other commodity transactions.

Within a month of the bankruptcy, ADM learned from the debtor that it was experiencing financial difficulty and that the commodities which it was to acquire under its one purchase contract with the debtor had been stopped in transit because of the debtor's failure to pay for them. Shortly after the debtor requested permission to pay ADM the open account balance over time, ADM terminated the four contracts under which it was to sell commodities to the debtor. To do so, ADM invoked the contractual provision which allowed it to terminate if the debtor's financial position became unsatisfactory.

After the bankruptcy filing, the trustee first sought to treat the contracts as executory and go forward with the debtor's purchases. When that relief was denied, the trustee attempted to avoid the termination of the contracts as a preference. The Seventh Circuit rejected the trustee's approach. It acknowledged the breadth of the definition of transfer, but found that ADM's cancellation of the contracts did not result in any transfer of the debtor's property. *See Commodity Merchants*, 538 F.2d at 1263. It stated that "[t]he essence of a transfer is the relinquishment of a valuable property right." *Id.* Applying this principle to the contracts and their cancellation clause, the Seventh Circuit concluded that ADM did not reacquire any rights from the debtor when the contracts were terminated because ADM reserved

---

1. The definition of transfer under the Bankruptcy Act was not materially different from the present definition found in the Bankruptcy Code. Section 1(30) of the Act provided: " 'Transfer' shall include the sale and every other and different mode, direct or indirect, of disposing of or parting with property or with an interest therein or with the possession thereof or of fixing a lien upon property or upon an interest therein, absolute or conditionally, voluntarily or involuntarily, by or without judicial proceedings, as a conveyance, sale, assignment, payment, pledge, mortgage, lien, encumbrance, gift, security, or otherwise; the retention of a security title to property delivered to a debtor shall be deemed a transfer suffered by such debtor."

the option to terminate if the debtor's financial condition deteriorated. *See id.* In short, because the contracts were terminated pursuant to their terms, no transfer occurred.

Subsequently, in *Matter of Wey*, the Seventh Circuit applied the same analysis to a real estate contract which had expired by its own terms. In *Wey*, the trustee sought recovery of the debtor's down payment which had been forfeited after the debtor failed to close as required by the contract. The contract required Wey to pay a down payment of $520,000 on April 10, 1984 and the remaining balance of $4.6 million on September 30, 1984. The contract also provided for forfeiture of the down payment if Wey defaulted. The trustee argued that the forfeiture of the down payment was a transfer and sought recovery of the down payment under either Code § 547 or § 548.

The Seventh Circuit agreed with the bankruptcy court that *Commodity Merchants* was directly applicable, and further explained that:

> Possession of expired rights is the equivalent of the possession of no rights. When a termination is pursuant to the terms of a contract, there is no transfer.

*Wey*, 854 F.2d at 199. The Seventh Circuit further amplified its decision by observing that "What Wey possessed after he tendered the down payment was an equitable interest in real estate. When he breached the contract, he lost that equity interest, as well as his down payment and both his rights and liabilities under the contract." *Id.*

In the matter at hand, § 5.2 of the Guide gives Freddie Mac the right to take whatever action it deems necessary to protect its interests, including disqualification or suspension of a seller or servicer. Under § 5.2, Freddie Mac may suspend or disqualify a seller or a servicer either for cause or without cause, and such action is effective immediately upon notice of suspension or disqualification. Significantly, § 5.2 also states that the decision to suspend or disqualify a seller without cause, or to terminate a servicer without cause is conclusive.

Thus, it is readily apparent that as in *Commodity Merchants* and *Wey*, the contract between LiTenda and Freddie Mac fully addressed the rights of both parties, and by its terms when Freddie Mac gave the notice of termination, LiTenda's right to service the Freddie Mac portfolio ceased to exist. Further, since Freddie Mac had reserved its right to terminate, Freddie Mac did not reacquire any rights. Thus, LiTenda's servicing rights in the Freddie Mac portfolio cannot be said to have been transferred by reason of its termination as a seller/servicer.

After the Freddie Mac motion to dismiss was argued, the Trustee's counsel submitted a postargument letter brief in which the Trustee further elaborated on her claim as to the nature of the asset purportedly transferred. Though the Court does not believe it is obligated to consider this unsolicited post-hearing submission, for the sake of completeness, the Court will address the point raised.

The Trustee claims that the LiTenda property interest that was transferred was the "net yield spread" which it retained on the portfolio of loans which it sold to Freddie Mac and continued to service until it was terminated.[2] The Trustee contends that LiTenda never sold the spread between the interest rate it extended to the borrowers and the yields it sold to Freddie Mac. Thus, the Trustee concludes that Freddie Mac's termination of LiTenda and placement of the servicing of the Freddie

---

2. In a typical transaction in which it purchases mortgages from a seller, Freddie Mac purchases the entire mortgage yield, net of the seller's servicing spread. (Guide § 9.4.) Thus, for example, if LiTenda originated a mortgage at 9% interest rate and sold it to Freddie Mac at a net yield of 8%, LiTenda would have retained a 1% servicing spread. (4/22/99 Trustee letter brief ¶ 2.)

Mac portfolio originated by LiTenda with another servicer constitutes a transfer.

The Court agrees with Freddie Mac that the Trustee's argument is at odds with the plain language of the contract between the parties, the Bankruptcy Code, and the Uniform Commercial Code.

First, there is absolutely no reference in the Guide or the purchase documents to any retained ownership interest in the mortgages sold by LiTenda to Freddie Mac. Instead, § 8.2 provides that servicers will be compensated for servicing, and other sections of the Guide treat the method for determining the seller/servicer's servicing spread. Now, it is certainly true that the income derived from the servicing of a portfolio of loans can constitute a valuable property interest. The FASB Statement of Financial Accounting Standards No. 122 states:

A mortgage banking enterprise usually retains the right to service mortgage loans it sells to permanent investors. A servicing fee, usually based on a percentage of the outstanding principal balance of the mortgage loan, is received for performing loan administration functions. *When servicing fees exceed the cost of performing servicing functions, the existing contractual right to service mortgage loans has economic value.* Because of their value, rights to service mortgage loans frequently have been purchased and sold. (emphasis supplied).

However, the Guide also addresses the compensation to be paid to a seller/servicer for the value of the income derived from servicing when Freddie Mac terminates a seller/servicer. Section 73.7 provides, in pertinent part:

Freddie Mac may terminate Servicing by the Servicer without cause with respect to any Mortgage Purchased in Whole or in part by Freddie Mac. Freddie Mac will notify the Servicer 90 days before the scheduled date of the termination of Servicing without cause. Within that 90-day period, the Servicer may arrange to transfer Servicing to another Servicer that is approved by Freddie Mac to service the particular portfolio being transferred. Such a transfer of Servicing is subject to the requirements of Chapter 56 and, if approved, must be completed within the time frame specified when Freddie Mac approves the transfer.

If the Servicer is unable to arrange to transfer Servicing within the 90-day period, as provided for above, Freddie Mac will terminate Servicing by the Servicer following the end of the 90-day period and will transfer the Servicing to a Servicer of Freddie Mac's choice. In this event, Freddie Mac will pay the terminated Servicer a termination fee equal to the market value of the Servicing portfolio being transferred as of the date of the Servicing is actually transferred. Any dispute concerning market value shall not delay the transfer of the Servicing.

From the foregoing, it is obvious that the contract between the parties recognizes a compensable economic interest on the part of a seller/servicer terminated without cause. It is equally obvious that the contract between the parties does not recognize such a compensable economic interest on the part of a seller/servicer terminated with cause. In any event, it is also plainly apparent that LiTenda's remedy, if one exists, is an action for damages based on its contract with Freddie Mac. It is precisely this type of litigation that is presently pending in the United States District Court. Finally, it is also notable that § 73.7 does not recognize that a seller/servicer retains an ownership interest in the loan portfolio.

Second, as Freddie Mac points out, pursuant to Guide § 16.4, the original of any note sold to Freddie Mac must be endorsed and delivered to Freddie Mac. The endorsement constitutes a negotiation of the note under U.C.C. § 3–202, which pursuant to U.C.C. § 3–201, vests all rights of the transferor in the transferee (Freddie Mac). The Trustee does not point to any

document which evidences a retention of any interest in any underlying note by LiTenda.

Finally, and perhaps most importantly, the plain language of Code § 541(d) is contrary to the Trustee's position. It provides:

> Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest, such as a mortgage secured by real property, or an interest is such a mortgage, *sold by the debtor* but as to which the debtor retains legal title *to service or supervise the servicing of such mortgage or interest,* becomes property of the estate under subsection (a)(1) or (2) of this section *only to the extent* of the debtor's legal title to such property, *but not to the extent of any* equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d) (emphasis added).

The court in *In re Cambridge Mortgage Corp.,* 92 B.R. 145, 150 (Bankr.D.S.C.1988), commented that a primary purpose of that section was the protection of the national secondary mortgage market and certain participants in that market, including Freddie Mac. The court included in its decision the remarks by Senator De Concini as to the purpose of § 541(d). *See id.* Of particular relevance to the matter before this Court is Senator De Concini's statement that:

> The application of section 541(d) to secondary mortgage market transactions will not be affected by the terms of the servicing agreement between the mortgage servicer and the purchaser of the mortgages. Under section 541(d) the trustee is required to recognize the purchaser's title to the mortgages or interest in the mortgages and to turn this property over to the purchaser.

124 Cong. Rec. 517413–14 (1978).

■ As is readily evident, the plain language of Code § 541(d) and its legislative history do away with the Trustee's contention that LiTenda held any interest in the underlying loans that became estate property when it filed its Chapter 7 case.

The Trustee also fails to state a cause of action under the New Jersey Uniform Fraudulent Transfer Act, N.J.S.A. 25:2–20 to –34 (1999) (the "Act"). Under the Act, the definition of a transfer is very similar to the Bankruptcy Code definition, as it encompasses every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other encumbrance within its scope. *See* N.J.S.A. 25:2–22. Therefore, the analysis applicable to the counts for relief under Code §§ 547 and 548 is equally applicable to the Trustee's state law claims. Consequently, the Court concludes that termination of this contract pursuant to its terms did not result in a transfer as defined in the Act.

### *The Turnover Action*

■ Freddie Mac also seeks dismissal of the turnover action set forth in the first count of the Trustee's adversary complaint. In that count, the Trustee demands turnover of LiTenda's servicing rights on the grounds that the servicing rights constituted property of the estate which the Trustee may use, sell or lease pursuant to Code § 363. Perhaps reflecting her ambivalence regarding the applicability of the turnover action, in the first count, the Trustee also requests compensatory and consequential damages for the value of the servicing rights. Of course, this alternative relief is essentially the same relief sought in the District Court Action.

Section 542(a) provides in pertinent part, that "an entity . . . in possession, custody or control, during the case of property that the trustee may use, sell, or lease under § 363 of this title . . . shall deliver to the trustee and account for such property or the value of such property." Additionally, § 542(b) provides that "an entity that owes a debt that is property of

the estate and that is matured, payable on demand, or payable on order, shall pay such debt to . . . the trustee."

Freddie Mac flatly denies that LiTenda has any ownership right in the servicing rights, inasmuch as it asserts that LiTenda's servicing rights were extinguished when Freddie Mac terminated LiTenda as a seller/servicer. Accordingly, Freddie Mac believes that the turnover action fails and must be dismissed because no matured debt exists in light of the fact that there is a bona fide dispute as to the very existence of the debt.

Examination of the question whether an action is properly characterized as a turnover proceeding typically occurs in connection with a determination whether a matter is a core or non-core proceeding. *See Beard v. Braunstein,* 914 F.2d 434, 443–44 (3d Cir.1990). Not infrequently, the purpose of the examination is to determine whether the alleged core turnover action is, in reality, a non-core state law contractual dispute. *See In re Charter Co.,* 913 F.2d 1575, 1579 (11th Cir.1990) (finding that turnover actions are not to be used to liquidate disputed contract claims).

■ Numerous courts have held that a turnover is not proper where a bona fide dispute exists. *See In re CIS Corp.,* 172 B.R. 748, 760 (S.D.N.Y.1994) ("The terms 'matured, payable on demand, or payable on order' create a strong textual inference that an action should be regarded as a turnover only when there is no legitimate dispute over what is owed to the debtor."); *In re F & L Plumbing & Heating Co.,* 114 B.R. 370, 376–77 (E.D.N.Y.1990) (where no set fund exists and other parties may have legal rights to the monies sought, no turnover action lies); *In re Ven–Mar Intern., Inc.,* 166 B.R. 191, 192–93 (Bankr.S.D.Fla. 1994) (section 542 does not provide a means to recover property where a dispute exists between the parties); *In re Matheney,* 138 B.R. 541, 546 (Bankr.S.D.Ohio 1992) (an action is properly characterized as one for turnover when the trustee or debtor in possession is seeking to obtain property of the debtor, not property owed to the debtor); *In re Kenston Management Co.,* 137 B.R. 100, 107 (Bankr. E.D.N.Y.1992) (an action for turnover only exists if the debt has matured and is "specific in its terms as to the amount due and payable").

■ The Court concurs with the Trustee that under Third Circuit case authority a "bona fide dispute" exists only when there is "a genuine issue of material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts." *B.D.W. Associates v. Busy Beaver Bldg. Ctrs.,* 865 F.2d 65, 66 (3d Cir.1989) (quoting *In re Busick,* 831 F.2d 745, 746 (7th Cir.1987) (quoting *In re Lough,* 57 B.R. 993, 997 (Bankr.E.D.Mich.1986))). Applying this definition to the facts at hand, the Court readily concludes that a bona fide dispute exists. After all, Freddie Mac vigorously denies that LiTenda retained any interest in any servicing rights after LiTenda was terminated as a seller/servicer by Freddie Mac. In essence, Freddie Mac disputes that LiTenda has any claim at all. Furthermore, earlier in this opinion the Court concluded that Freddie Mac's termination of LiTenda pursuant to the terms of their contract extinguished LiTenda's interest in the servicing rights. At most, after termination, LiTenda possesses a contract for damages in an undetermined amount. Since the damages, if any, are unliquidated, any debt owed is unmatured. Accordingly, applying the case authority cited above, the Court is persuaded that the Trustee has not stated a cause of action for turnover.

In the course of the hearings on this matter, the Trustee's basis for her turnover action was modified. The Trustee now also argues that LiTenda retained an ownership interest in the servicing spread on the portfolio of loans which it sold to Freddie Mac, and that retained interest should be turned over to the estate. Alternatively, the Trustee urges the Court to

find that Freddie Mac's termination of Li-Tenda caused a forfeiture of LiTenda's servicing rights which amounts to an unenforceable penalty.

To support her claim that the termination of LiTenda as a seller/servicer amounts to an unenforceable penalty, the Trustee relies on *Metlife Capital Fin. Corp. v. Washington Ave. Associates,* 313 N.J.Super. 525, 713 A.2d 527 (App.Div. 1998), *rev'd,* 159 N.J. 484, 732 A.2d 493 (1999). The Appellate Division in *Metlife* concluded that the late fee and default interest rate imposed by the lender did not constitute reasonable liquidated damages. On review, the New Jersey Supreme Court examined the same clauses on the basis of whether they were reasonable under the totality of the circumstances and concluded that both the late fee and the default interest rate were valid liquidated damages provisions. *See Metlife,* 159 N.J. at 505, 732 A.2d at 504–505.

Applying *Metlife,* the Trustee urges that the termination provision in the Guide which authorizes Freddie Mac to terminate a servicer/seller for cause and not pay any damages as a result of that termination, constitutes an unenforceable penalty as it bears no reasonable relationship to the damages, if any, suffered by Freddie Mac by reason of a seller/servicer breach. The Trustee attempts to demonstrate the unreasonableness of the termination provision by noting that Freddie Mac can terminate a seller/servicer for cause whether the seller/servicer improperly transfers as little as $1 or as much as $150,000 out of a Freddie Mac account.

This Court expresses no opinion on the merits of the Trustee's interpretation of the termination provision found in the Guide as an unenforceable penalty. Merely stating the Trustee's position makes it abundantly clear that the Trustee's theory will not support a turnover action. Under the *Metlife* test, if the termination clause can be construed as a liquidated damages clause, then the reasonableness of the provision must be determined after an exami-nation of the totality of the circumstances. These are formidable obstacles. Moreover, Freddie Mac contends that the Trustee wholly mischaracterizes the termination provision and the relationship of the parties. Manifestly, a bona fide dispute exists which precludes the Trustee's new theory from forming an adequate basis for a turnover action.

The Trustee's assertion that turnover is warranted because LiTenda retained an interest in the servicing income even after its termination by Freddie Mac is equally untenable. At best, it is merely the Trustee's interpretation of the Guide and the parties' expectations. As with the other asserted bases for turnover, Freddie Mac disagrees with the Trustee's interpretation, and accordingly, this theory also cannot sustain a turnover action.

### CONCLUSION

For the reasons set forth at greater length above, Freddie Mac's motion to dismiss all counts of the adversary complaint is granted. Because the Court has granted Freddie Mac's motion, it will not address the Trustee's cross motion for summary judgement, as it is effectively moot.